# MINNEAPOLIS EASTERN RAILWAY COMPANY *v.* MINNESOTA.

### ERROR TO THE SUPREME COURT OF THE STATE OF MINNESOTA.

No. 1113.   Argued January 13, 14, 1890.—Decided March 24, 1890.

The case of *Chicago, Milwaukee & St. Paul Railway Co.* v. *State of Minnesota, ante,* 418, affirmed, on substantially the same state of facts.

The statutory provisions existing in the present case as to the fixing by the railroad company of reasonable charges for the transportation of property, did not constitute such a contract with it, as to deprive the legislature of its power to regulate those charges.

THIS was argued with *Chicago, Milwaukee & St. Paul Railway Co.* v. *State of Minnesota, ante,* 418, the two causes presenting substantially the same questions. The case is stated in the opinion.

*Mr. W. C. Goudy* and *Mr. James H. Howe* for plaintiff in error. *Mr. W. H. Norris* filed a brief for same.

*Mr. Moses E. Clapp* and *Mr. H. W. Childs,* for defendant in error, urged the same considerations as in the previous case, and further, on the point on which the opinion turns, as follows:

The act in question does not amount to taking property without due process of law.

We do not think it necessary to follow counsel for plaintiff in error in their discussion of what is meant by due process of law. Stress is laid upon the fact that, by the terms of the law under consideration, no notice was given of the contemplated action of the commission. We think counsel have confounded an attempted taking of property by the State with the simple exercise of a legislative function in the enactment of a law.

While the order in question was made by the commission, yet under the construction of the law placed upon it by the

Supreme Court of Minnesota, which construction is binding upon this court, the act of establishing the rate in question is a legislative act. In fact it is upon this theory that it had to be sustained. The rate as fixed must be considered as fixed by the legislature and no notice was necessary. Had the legislature by express terms declared that the plaintiff should charge no rate above one dollar per car, it would not be suggested that such an act would be void because the company had received no notice of its contemplated passage. If a legislature may regulate rates, and in doing so act through the medium of a commission, a notice of any contemplated action by the commission would no more be required, unless required by the terms of the act itself, than notice of the probable passage of the act.

The operation of the act would not amount to a taking of private property without compensation.

That this would be the effect of any and all regulations is, it seems to us, a sufficient answer in itself. Any regulation that, in the slightest degree, reduces the earnings of a common carrier must then be said to amount to a taking of property without compensation; but this court has affirmed the right to regulate rates when unrestrained by special charter, and until the case at bar, the right has not been questioned. The right to regulate necessarily involves the right to reduce the income of the company.

In *Railroad Commission Cases*, 116 U. S. 307, the court says: "General Statutes, regulating the use of railroads in a state, or fixing maximum rates of charges for transportation, when not forbidden by charter contracts, do not necessarily deprive the corporation, owning or operating a railroad within the State, of its property without due process of law, within the meaning of the Fourteenth Amendment of the Constitution of the United States, nor take away from the corporation the equal protection of the laws. *Munn* v. *Illinois*, 94 U. S. 113, 134, 135; *Railroad Company* v. *Richmond*, 96 U. S. 521, 529; *Spring Valley Water Works* v. *Schottler*, 110 U. S. 347, 354."

In *Georgia Banking Co.* v. *Smith*, 128 U. S. 174, 179, the

court says, "It has been adjudged by this court in numerous instances that the legislature of a state has the power to pre- scribe the charges of a railroad company for the carriage of persons and merchandise within its limits, in the absence of any provision in the charter of the company constituting a contract vesting in it authority over those matters, subject to the limitation that the carriage is not required without re- ward, or upon conditions amounting to the taking of property for public use without just compensation, and that what is done does not amount to a regulation of foreign or interstate commerce. *Stone* v. *Farmers' Loan and Trust Co.*, 116 U. S. 307, 325, 331; *Dow* v. *Beidelman*, 125 U. S. 680."

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

This is a writ of error to the Supreme Court of the State of Minnesota, to review its judgment awarding a peremptory writ of mandamus against the Minneapolis Eastern Railway Company, commanding it to comply with the requirements of the recommendation and order made by the Railroad and Warehouse Commission of the State of Minnesota, on the 2d of August, 1887, and to change its tariff of rates and charges for handling and switching any car over the lines of its rail- way in the city of Minneapolis, regardless of the distance or the character of the freight in such car, and to substitute therefor the tariff recommended, published and posted by said commission, to wit, the rate of $1.00 for handling and switching any car over its line of railway in said city, regard- less of the distance or the character of the freight in such car, being the rate published by the commission and declared to be equal and reasonable. The case arose under the same statute considered in the case of *Chicago, Milwaukee & St. Paul Railway Co.* v. *Minnesota*, just decided, *ante*, 418.

The Minneapolis Eastern Railway Company was and is a railroad corporation duly created and organized under the general railroad law of the State of Minnesota, operating one or more lines of railway in the city of Minneapolis in that State, and a common carrier engaged in transporting freight

and property by rail within the limits of that city, and more particularly engaged in the business of handling and switching cars over its line or lines of railroad within said limits, and, as such common carrier, enjoying the right to conduct its business within the State of Minnesota, subject to the pro-vision of section 4, of article 10 of the constitution of that State, and bound to carry minerals, agricultural and other productions and manufactures on equal and reasonable terms. Prior to the 7th of July, 1887, the company had and main-tained in force a schedule of its tariff of rates within the city of Minneapolis, as follows: For handling and switching empty cars over its lines of railway within the limits of the city, $1.25 per car; for handling and switching loaded cars over its lines of railway within the limits of the city, $1.50 per car; and prior thereto said schedule of rates had been published by the company.

On the 7th of July, 1887, the Railroad Commission consti-tuted by said act made an order which was served upon the company, and on the 2d of August, 1887, made a further order, a notice of which was served on the company in the following terms:

"Whereas, at a regular meeting of the Railroad and Ware-house Commission of the State of Minnesota, held at the office of said commission, in the city of St. Paul, in said state, on the 7th day of July last, and pursuant to section 8 of an act entitled 'An act to regulate common carriers, and creating the Railroad and Warehouse Commission of the State of Minne-sota, and defining the duties of such commission in relation to common carriers,' approved March 7th, 1887, a notice of order was then and there made and issued by said commission and duly served upon you, of which the following is a copy, namely:

"'Whereas, all railroad companies owning or operating terminal or switching facilities at or within the city of Min-neapolis, in said State, with the exception of the Chicago, Milwaukee and St. Paul Railway Company, pursuant to sub-division (d) of section 8 of an act entitled "An act to regulate common carriers, and creating the Railroad and Warehouse

Commission of the State of Minnesota, and defining the duties of such commission in relation to common carriers," approved March 7th, 1887, have filed with this commission copies of their several schedules of rates and charges for switching cars on their respective tracks at and within said city; and whereas it appears from said schedule that the rates and charges made by said companies vary from twenty-five cents per car for empty cars to two dollars per car for loaded cars; and whereas said commission, after due and careful inquiry and consideration, do find that each and every charge in excess of one dollar per car for switching within the limits of said city of Minneapolis is unreasonable and an excessive compensation for the service performed: Now, therefore, it is ordered and determined by this commission, pursuant to the authority in them vested by the aforesaid legislative act, that all such schedules be changed by striking therefrom all charges or rates in excess of one dollar per car for the switching or transfer thereof and insert in room of the words or figures stricken out the words " one dollar" or the appropriate sign and figure therefor. It is the object and purpose of this order to establish one dollar as the maximum charge for the switching or transfer of any car at or within the limits of said city without regard to distance or the kind of goods or merchandise with which the car so switched or transferred may be loaded;'

" And whereas, by the subsequent action of said commission, of which said action you were duly notified by order of the commission, the said order or notice should not take effect or be considered to be of binding force upon you until the fifteenth day of said month;

" And whereas you have neglected and refused for more than ten days after and since the fifteenth day of July last to substitute such tariff of rates or charges or to adopt the same as recommended and directed by said commission, as in and by said notice and order you were recommended and required to do, and do still so neglect and refuse:

" Now, therefore, we, the said commission, do hereby publish and declare the said tariff of rates, namely, one dollar per

car for the switching or transfer of any loaded car by you within the limits of the said city of Minneapolis, as and to be the legal, equal and reasonable charge for such switching or transfer of cars by you, and that the same is now in force and effect in place of the charges and rate of compensation by you heretofore charged for such service.

"You, the said railway company, your agents and employés, will act accordingly or answer for a violation of the section and act to which reference is above made."

On the 10th of January, 1889, the commission, by the attorney general of the State made application in writing to the Supreme Court of the State to compel the company to comply with the recommendations made to it by the commission to change its tariff of rates for handling or switching cars within the city of Minneapolis, and to substitute therefor the tariff recommended by the commission, and to adopt the rates declared by the commission to be equal and reasonable for such services. The application set forth the schedule or tariff of rates so maintained by the company prior to the 7th of July, 1887, for switching empty and loaded cars over its lines of railway within the limits of the city of Minneapolis, the finding of the commission, on the 7th of July, 1887, that such schedule of rates was unequal and unreasonable, and its order establishing one dollar as the maximum charge for switching or transferring any car within the limits of the city, without regard to distance or the kind of goods with which it might be loaded; that the company had been duly notified of such action of the commission, and had neglected, for more than ten days after the 15th of July, 1887, to substitute or adopt the tariff of charges recommended and directed by the commission; that the commission had duly posted and published the tariff declared by it to be equal and reasonable; and that the company still refused to carry out the recommendation of the commission so made, published and posted, and continued to charge the rates so specified as its schedule tariff.

An alternative writ of mandamus was applied for and issued, commanding the company to adopt the rate of charges so declared by the commission to be equal and reasonable for

handling and switching cars within the city of Minneapolis, or to show cause why it had not done so, on the 15th of January, 1889.

By its return, filed January 21, 1889, the company made answer to the alternative writ as follows:

"That this respondent was organized as a railway company under and by virtue of the General Laws of the State of Minnesota, on or about the 17th day of June, A.D. 1878.

"That on or about the 27th day of January, A.D. 1879, its articles of association were amended so as to declare and make the general nature of its business to be the building and operating of a railway from the city of Minneapolis, in the county of Hennepin, and State of Minnesota, to the city of St. Paul, in the county of Ramsey, in said State, with branches connecting with any and all railroads then built or thereafter to be built or secured or constructed to or into the said cities or either of them; also branches to mills and manufactories in said cities or in either of them; the said railway and branches to be constructed and operated with one or more tracks and with necessary side-tracks, turn-outs and connections and all necessary roadways, right of way, depot grounds, yards, machine shops, warehouses, elevators, station-houses, structures and buildings, rolling stock, and all other real estate and personal property necessary or convenient for the operation and management of said railway.

"That the total length of its tracks heretofore constructed is about three and one-half (3½) miles, and that said tracks are and at all times have been wholly within the city of Minneapolis.

"That the total cost to this respondent of its said system of railway and of the equipment thereof is the sum of two hundred and fifty-three thousand one hundred and forty-eight dollars and eleven cents ($253,148.11), embracing the following items:

"For right of way and damage to buildings, one hundred thousand one hundred and two dollars and ninety-nine cents . . . . . . . . . . $100,102 99

"For grading and surfacing, nine thousand two hundred and thirty-seven dollars and sixty-four cents . . . . . . . . . . . . . . . . 9,237 64

"For bridges, docking and trestle, sixty-four thousand seven hundred and six dollars and ninety-four cents . . . . . . . . . . . . . . . 64,706 94

"For ties, iron and steel, track-laying, crossing, switches and side-tracks, twenty-nine thousand twenty dollars and sixty-seven cents . . . . 29,020 67

"For buildings, two thousand two hundred and fifty-two dollars and seventy cents . . . . . 2,252 70

"For incorporation and legal expenses and engineering, six thousand one hundred and fifteen dollars and sixteen cents . . . . . . . . . 6,115 16

"For office furniture and track-scales, four hundred and forty-seven dollars and fifty-five cents 447 55

"For one (1) locomotive engine and one (1) hand car, six thousand one hundred and fifty-four dollars and seventy-seven cents . . . . . . 6,154 77

"And for divers other items, thirty-five thousand one hundred and nine dollars and sixty-nine cents . . . . . . . . . . . . . . . . 35.159 69

"That, since the acquisition of this respondent's said right of way, the value of real estate in the city of Minneapolis, as well adjacent to said railway as in said city at large, has increased many fold, and the acquisition of said right of way would at this time cost many times the amount laid out and expended therefor by this respondent.

"That but thirty thousand ($30,000) dollars of its capital stock has ever been issued.

"That on or about the 1st day of January, A.D. 1879, this respondent, being thereto duly authorized by law, made, executed and delivered to Sherburne S. Merrill and William H. Ferry as mortgagees, in trust to secure the payment of the bonds hereinafter mentioned, with the interest thereon, a mortgage or deed of trust, bearing date on that day, whereby it granted, bargained, sold and conveyed unto the said trustees

all its railroad then in course of construction on the west side of the Mississippi River, being much the greater proportion of its entire present system, including all the railways, ways, rights of way, depot grounds and other lands for rights of way or for railway uses; all tracks, bridges, viaducts, culverts, fences and other structures; all depots, station-houses, engine-houses, car-houses, freight-houses, wood-houses and other buildings; all shops then held or thereafter to be acquired or used in connection with said railroad or the business thereof, and all locomotives, tenders, cars, rolling stock or equipment; all machinery, tools, implements, fuel, and materials for constructing, operating, repairing, or replacing said railroad or any part thereof, or of any part of its equipment or appurtenances then held or thereafter to be acquired; also all franchises connected with or relating to said railroad or to the construction, maintenance, or use thereof then held or thereafter to be acquired by the said respondent, including the franchise to be a corporation, and all and singular the hereditaments thereunto belonging or in anywise appertaining, and all the real estate, right, title, interest, property, possession, claims and demands whatsoever, as well in law as in equity, of the said respondent of, in, and to the same and any and every part thereof; which mortgage or deed of trust expressly provided that the trust thereby created should not affect any further extension or branches of said line of railroad, or any property acquired or to be acquired for use in connection with such extension or branch, and which said mortgage or deed of trust was recorded in the office of the register of deeds in and for the said county of Hennepin, in volume 54 of mortgages, on pages 377 to 387 inclusive.

"That under and by virtue of the said mortgage or deed of trust, and pursuant to the tenor thereof, this respondent, on or about the first day of January, 1879, made and executed in due form of law, and thereafter negotiated and disposed of one hundred and fifty (150) bonds or writings obligatory for the sum of one thousand ($1000) dollars each, and all of like tenor, bearing date the 1st day of January, 1879, and payable in thirty (30) years after the date thereof, with interest at the

rate of seven (7) per cent per annum, payable semi-annually, on the first days of January and July in each year, upon the presentation and surrender of coupons thereto respectively annexed, representing and requiring the payment of each such instalment of interest, by reason whereof this respondent became liable to pay the sum of ten thousand and five hundred ($10,500) dollars per annum for such interest on its said bonds so issued and negotiated; which mortgage is still in full force and effect and all which bonds and coupons are still outstanding and wholly unpaid.

"That all the proceeds of said stock so issued and all the proceeds of said bonds so negotiated were used in the construction and equipment of respondent's said railway.

"That all such proceeds were insufficient for that purpose, and this respondent therefore, from time to time, for that purpose, effected and further became indebted for further loans of money, without security therefor, to the amount of about ninety thousand ($90,000) dollars; all which was used in the construction and equipment aforesaid.

"That this respondent began the operation of the said railway on or about the 1st day of June, 1879, and has continued to operate the same at all times hitherto.

"That its whole business now is, and at all times has been, the receipt, transportation and delivery, commonly called switching, of cars between the tracks of other railway companies and mills, warehouses and industries situated upon its own lines within said city of Minneapolis.

"That, until the 1st day of September, 1882, it charged for its services in switching only the sum of one dollar ($1.00) per loaded car; that on the day last aforesaid it raised its charge for such service, and has ever since charged and received for such service the sum of one dollar and fifty cents ($1.50) per loaded car.

"That the service so rendered by this respondent is of a character which would otherwise be performed by drays or wagons, at an expense to patrons very much greater than the last-mentioned rate of charge of this respondent.

"That the rate of one dollar and fifty cents ($1.50) per

loaded car above stated does not exceed, but is, a fair and reasonable charge for such service.

"This respondent further says, that from the beginning of the operation of said railway to and including the 30th day of June, 1887, notwithstanding such increase of rate, the gross earnings of this respondent were less than the amount of its operating expenses and of the interest to that date accrued upon its said mortgage bonds, by the sum of twenty-one thousand two hundred and twenty-three dollars and seventy-six cents ($21,223.76).

"That all the excess of its gross earnings over its operating expenses has been, from year to year, applied to the repayment of the aforesaid unsecured indebtedness for moneys used in construction and equipment and the interest thereon.

"That on the 30th day of June, 1888, there nevertheless remained unpaid of the indebtedness last mentioned and interest thereon the sum of twelve thousand two hundred and eleven dollars and two cents ($12,211.02), of which last-mentioned sum, by like application of such excess, the sum of ten thousand dollars ($10,000) was paid on or before the 30th day of November, 1888, then still leaving a balance of such unsecured indebtedness and of the interest thereon, in the sum of two thousand two hundred and eleven dollars and two cents ($2211.02).

"That, by reason of such application of the excess of gross earnings over operating expenses, no interest whatever has ever been hitherto paid, and this respondent has had no funds wherewith to pay any interest whatever upon its aforesaid bonded indebtedness, but that the same has accumulated and remains unpaid to the amount of one hundred and five thousand ($105,000) dollars.

"This respondent further says, that, in the year ending on the 30th day of June, 1888, its last-completed fiscal year, it transported over its lines twenty-seven thousand two hundred and seventy-two (27,272) loaded cars, which was its entire business, and that it received as compensation therefor, at the rate of one dollar and fifty cents ($1.50) per car, the sum of forty thousand nine hundred and eight ($40,908) dollars, which last-mentioned sum constituted its entire receipts for that year.

" That it therewith paid its operating expenses for the same year, amounting to twenty-two thousand five hundred and eighty-three dollars and seventy-eight cents ($22,583.78), and paid the whole residue thereof on account and in reduction of its unsecured indebtedness aforesaid and the interest thereon.

". That the said year was an unusually prosperous one, and was the first year in the history of this respondent when it earned a sum equal to the amount of its operating expenses and one year's interest upon its said bonded indebtedness.

" That, induced by its gradual reduction and payment as aforesaid of its said unsecured indebtedness, the creditors of this respondent for the said unsecured indebtedness have hitherto, with the assent and at the request of this respondent, as the said interest coupons have from time to time become due, advanced the amounts thereof to the holders of said coupons, and thereupon and thereby taken the same up from such holders by way of payments for the honor and for the protection of the credit of this respondent, in order to avoid any foreclosure on the part of the holders of said bonds by reason of default in the payment of any such coupons, and that so, and not otherwise, has this respondent hitherto been able to avoid such foreclosure.

" The respondent further says, that a portion of its said railroad upon the west side of said river, about one thousand and two hundred (1200) feet in length, is upon wooden trestlework, which is now nearly ten (10) years old, and about one thousand one hundred (1100) feet in length of which is so decayed and worn that the same must be almost entirely renewed and rebuilt within the current year 1889, if the operation of said railroad is to be continued.

" That this respondent has no source of revenue to meet the expense of rebuilding other than its earnings.

" That, if said trestle is rebuilt of wood, the cost thereof will exceed the sum of fifteen thousand ($15,000) dollars, and if of iron or steel will exceed the sum of eighty thousand ($80,000) dollars.

" The respondent further says, that if the order of the relators set forth in said alternative writ had been forthwith and

hitherto enforced, and if this respondent had received but one ($1.00) dollar per car for the service rendered during its last fiscal year aforesaid, the entire receipts from all its business in said year would have been but twenty-seven thousand two hundred and seventy-two ($27,272.00) dollars, which would have left this respondent but four thousand six hundred and eighty-eight dollars and twenty-two ($4688.22) cents wherewith to pay the residue of its unsecured indebtedness aforesaid, then exceeding twelve thousand dollars ($12,000), or to pay the sum of ten thousand and five hundred dollars ($10,500) interest accrued upon the said bonded debt, leaving nothing for extraordinary repairs, and nothing for renewals of trestles, bridges, or rails.

"That this respondent is the owner of all the railway used in conducting its said business, subject only to the lien of said mortgage.

"That it is entitled to the possession and beneficial use thereof to the same extent as the owners of other property are entitled to the beneficial use thereof; that it has the right to fix the price for the use of its property by others, and at the rate at which it will do business for others, subject only to the qualification that the rates so fixed shall be equal and reasonable.

"That the rate of one dollar and fifty cents ($1.50) per car so fixed and collected by it as aforesaid is fair, just, equal and reasonable; that the rate of one dollar ($1.00) per car specified in said order of relators is grossly unfair, unjust, unequal and unreasonable, and beyond the jurisdiction and power of the said relators in that behalf.

"That the said recommendation of the said relators set forth in said alternative writ, by means whereof they seek to compel a reduction in the rate fixed by this respondent from one dollar and fifty cents ($1.50) per car to one dollar ($1.00) per car and a consequent loss in revenue of one-third ($\frac{1}{3}$) of its entire earnings, was made by said relators without notice to this respondent, and without giving it any opportunity to be heard in its own behalf, and that for that reason the said recommendation is against the common rights of American citizens and is in

violation of the Constitution of the United States, and is wholly
void.

"And this respondent further says, that if the said order be
enforced by the mandate of this court, it will take the property
of this respondent against its will, without due process or any
process of law, and in violation of section 1 of article 14 of the
Constitution of the United States; that, if the said order of
the said relators be enforced against this respondent, and if its
charge be reduced to one dollar ($1.00) per car, this respondent
will be thereby deprived of the ability to pay the interest upon
its said bonded indebtedness, as it has, with the consent of the
State of Minnesota, contracted to do, and that any law of
the said State, or any order of the said relators, or any judg-
ment of this court, preventing the respondent from performing
its said contract, when without such law, order, or judgment
it might have performed the same, or might thereafter per-
form the same, is and will be a law, order and judgment im-
pairing the obligation of a contract, and is and will be in
violation of section 10 of article 1 of the Constitution of the
United States, and is and will be wholly void.

"This respondent, further making return, says, that the
said order of the said relators, set forth in said alternative
writ, will, if enforced, deprive it of its property for the use
and benefit of private citizens, without making any compensa-
tion unto it as the owner thereof, in violation of section 13 of
article 1 of the constitution of the State of Minnesota, and is
and will be wholly void.

"And this respondent, further making return, says that, by
the provisions of section 4 of article 10 of the constitution of
said State, this respondent, being a common carrier, enjoying
the right of way in pursuance of the provisions of the said
constitution, is bound to carry the mineral, agricultural and
other productions of the people of said State on equal and
reasonable terms; that it has always so carried the same
whenever tendered or offered to it for that purpose; that the
terms offered by it have always been equal and uniform to all
persons and have always been reasonable in amount.

"And this respondent avers, that it is entitled to have and

receive reasonable compensation for the service it is so bound to render, and that the said order of said relators, set forth in said alternative writ, assumes to fix a grossly inadequate and unreasonable compensation therefor, is in violation of the constitutional provision last mentioned, and is wholly null and void.

"That, by reason of the matters hereinbefore set forth, this respondent has not complied, and ought not to be by the mandate of this honorable court compelled to comply, with the requirements of the recommendation and order made on the 2d day of August, 1887, and in said alternative writ set forth.

"Wherefore this respondent prays the judgment of the court that the said alternative writ may be discharged and that this respondent may be hence dismissed."

On a hearing on the return, on the 29th of January, 1889, the company asked leave to make proof of the matters set forth in the return, at such time as the court might appoint; but the request was denied; and the company excepted. On the motion of the attorney general, judgment was then entered on the application, the alternative writ and the return, for the issuing of a peremptory writ of mandamus, to review which judgment this writ of error is sued out.

The Supreme Court rendered an opinion stating that, as the case was similar to that of *The State ex rel. The Railroad and Warehouse Commission* v. *The Chicago, Milwaukee & St. Paul Railway Co.*, before decided by it, the decision would follow the decision in that case and upon the reasons stated in the opinion filed therein.

The views and considerations applicable to that case, *Chicago, Milwaukee & St. Paul Railway Co.* v. *Minnesota*, which has just been decided by us, *ante*, 418, apply with even greater force to the present case, as appears by the return above set forth at length.

The Minneapolis Eastern Railway company was organized as a corporation in June, 1878, under title 1, chapter 34 of the General Statutes of Minnesota. By § 2 of an act of the legislature, approved March 3, 1869, (Laws of 1869, c. 78, 95,) it was provided "that any railroad company or corporation

organized under the title to which this is an amendment, may charge and receive for the transportation of passengers and freight on their road such reasonable rate as may be from time to time fixed by said corporation or prescribed by law." By § 8 of chapter 103 of the General Laws of Minnesota of 1875, it was provided as follows: "No railroad company shall charge, demand or receive from any person, company, or corporation an unreasonable price for the transportation of persons or property, or for the hauling or storing of any freight, or for the use of its cars, or for any privilege or service afforded by it in the transaction of its business as a railroad corporation." We do not perceive that these statutory provisions constitute such a contract with the corporation as to the fixing by it of its rates of charges, as to deprive the legislature of its power to regulate those charges.

The decision of the commission in the present case appears to be merely a general finding that each and every charge in excess of $1.00 per car for switching within the limits of the city of Minneapolis is an unreasonable and excessive compensation for the service performed. The commission states that it made such finding after due and careful inquiry and consideration; but it does not appear that the Minneapolis Eastern Railway Company had any prior notice of any hearing at which such finding was made, or any opportunity of being heard in regard thereto; while it does appear that it asked leave of the court to make proof of the matters so set up in its return, that its request was denied, and that it excepted to such denial; and it further appears by its return that it claimed that the rate of $1.00 per car would be so unfair, unequal, unjust and unreasonable as to take its property against its will without due process of law.

For the reasons set forth in the other case just decided, *ante*, 418,

> *The judgment of the Supreme Court of Minnesota, rendered February 27, 1889, awarding a peremptory writ of mandamus against the railway company, is reversed, and the case is remanded to that court with an instruction to take further proceedings not inconsistent with the opinion of this court.*

## CORRECTION.

On page 482, after the last line, add,

"JUSTICES BRADLEY, GRAY, and LAMAR dissented for the reasons given in their dissenting opinion in *Chicago &c. Railway Co. v. Minnesota*, ante, 461."