Filed Jan. 28, 1886.

---

No. 12,703.

## HOCKETT v. THE STATE.

TELEPHONE.—*State Regulation.—Act Limiting Rental Price of Instruments.— Constitutional Law.*—The State has the right to prescribe the maximum price which a telephone company shall charge for the use of its telephones, and the act of April 13th, 1885, limiting the rental price of such instruments, and also the amount which shall be collected for conversations between cities and villages, is constitutional.

SAME.—*Patent.—Power of State to Regulate Property Created Under.*—The fact that the telephone and appliances are articles patented under the Con-

stitution and laws of the United States, while vesting in the patentee, his heirs and assigns, the exclusive right, for a limited time, to make, use and vend the tangible property brought into existence by the application of the discovery covered by the letters patent, does not preclude State regulation of the property thus brought into existence.

SAME.—*Property Devoted to Public Use.*—In legal contemplation all the instruments and appliances used by a telephone company in the prosecution of its business are devoted to a public use, and property thus devoted to such use becomes a legitimate subject of legislative regulation.

SAME.—*Guaranteed Rights in Property.*—State regulation of property devoted to a public use is not the *taking* of property for a public purpose within the meaning of section 21, of article 1, of the Constitution of this State, nor is it an interference with the guaranteed rights of the citizen in private property.

SAME.—*Word "Telephone" Includes all Instruments for Reception and Transmission of Messages.*—The word "telephone," as used in the act of April 13th, 1885, was intended to designate, and did in fact refer to an apparatus composed of all the usual and necessary instruments for the transmission and reception of telephonic messages, and not to a single instrument only.

SAME.—*Term of Art.*—*Evidence.*—The word "telephone" having become a term of art, evidence is admissible to explain its proper meaning.

SAME.—*Legislative Intention.*—There being nothing in the act of April 13th, 1885, or in other laws, which requires a telephone company to construct a new line against its will, or to maintain an old line longer than it may feel justified in doing, evidence that it could not construct, or continue to use, a particular line at the price limited without loss, can not be considered in determining the legislative intention in passing such act.

SAME.—*Justice or Expediency of Act.*—*Remedy.*—Where a statute is one which the Legislature had power to enact, the courts can not sit in judgment upon either its justice or expediency, but relief must be sought of the Legislature.

From the Marion Criminal Court.

*J. E. McDonald, J. M. Butler, A. L. Mason, T. A. Hendricks, C. Baker, O. B. Hord, A. W. Hendricks, A. Baker, E. Daniels, N. Williams, J. L. Thompson,* and *C. S. Holt,* for appellant.

*F. T. Hord,* Attorney General, *A. C. Harris, W. H. Calkins, C. Byfield* and *L. Howland,* for the State.

NIBLACK, C. J.—On the 13th day of April, 1885, the Legislature of this State passed an act entitled "An act to regu-

late the rental allowed for the use of telephones, and fixing a penalty for its violation," the tenor of which is as follows:

" Section 1. *Be it enacted by the General Assembly of the State of Indiana,* That no individual, company or corporation, now or hereafter owning, controlling or operating any telephone line in operation in this State shall be allowed to charge, collect or receive as rental for the use of such telephones, a sum exceeding three dollars per month where one telephone only is rented by one individual, company or corporation. Where two or more telephones are rented by the same individual, company or corporation, the rental per month for each telephone so rented shall not exceed two dollars and fifty cents per month.

" Sec. 2. Where any two cities or villages are connected by wire operated or owned by any individual, company or corporation, the price for the use of any telephone for the purpose of conversation between such cities or villages, shall not exceed fifteen cents for the first five minutes, and for each additional five minutes no sum exceeding five cents shall be charged, collected or received.

" Sec. 3. Any owner, operator, agent or other person, who shall charge, collect or receive for the use of any telephone any sum in excess of the rates fixed by this act, shall be deemed guilty of a public offence, and on conviction shall be fined in any sum not exceeding twenty-five dollars."

On the 27th day of July 1885, Theodore P. Haughey requested the Central Union Telephone Company, a corporation organized under the laws of the State of Illinois, but owning and operating a telephone exchange, and system of telephone lines, at the city of Indianapolis, in this State, to rent him one telephone, to be used at his residence upon his farm, four and one-half miles from the company's telephone exchange, and two miles outside of the corporate limits of the city of Indianapolis, and to connect such telephone with the exchange by the erection of the necessary poles and wires. In response to this request, the company offered to rent to

Haughey a hand telephone and magneto bell, and to connect them with its exchange, and to furnish exchange service from 7 o'clock A. M. until 6 o'clock P. M., each day, for $3 per month, the company to have the right to place other subscribers upon the same line. But Haughey declined to accept that offer, and instead entered into a contract with the company for the use of "one battery transmitter and one magneto telephone," and "the necessary appliances for connecting them with the exchange," upon certain terms and conditions named in the contract, for which he agreed to pay the company the sum of $33.50 for each quarter, or $11.16⅔ per month.  The contract says:

"The above total sum is based upon the charges itemized as follows:

"Rental of one magneto telephone and one
    battery transmitter (two telephones), at the
    rate of . . . . . . . . . . . . . . . . $20 per annum
"Labor and service charges for switching,
    construction and maintenance charges for
    lines, batteries, central office apparatus,
    magneto bell and other appurtenances, at
    the rate of . . . . . . . . . . . . . . $114 "     "  "

The telephone company built the line and furnished the equipments for the use of Haughey, called for by its contract with him.

At the expiration of the first three months after the contract went into effect, the appellant, John E. Hockett, acting as the district superintendent and general agent of the company at Indianapolis, demanded of, and received from Haughey the sum of $33.50, claimed to be due under the contract for the latter's use of the line and equipments therein provided for, during the preceding three months.

An information was thereupon filed against Hockett, charging him with a violation of the provisions of the act of the Legislature, herein above set out, and, upon proof of the matters above stated, with others of a formal, incidental, or a

Hockett v. The State.

merely collateral character, the court below found him guilty of having charged more for the use of a telephone than the law permitted him, as well as the company he represented, to do, and, after overruling a motion for a new trial, adjudged that he pay a fine as a penalty for the commission of a criminal offence.

It was shown at the trial that the articles furnished to Haughey as a telephone equipment, as well as all the other mechanical contrivances used by the company in the transmission of words and sounds over its wires, are patented articles, and that the company holds the right to use these patented articles by assignment either direct or remote from the patentee.

It is first and most earnestly contended that, as the articles used by the company as above are patented, under the Constitution and laws of the United States, the Legislature of a State has no power to limit the price, use, sale or rental value of such articles, and that, as a consequence, all acts of a State Legislature of the class to which the one before us belongs, are inoperative and ineffectual for any practical purpose. Conceding the force, as well as the plausibility, of many of the arguments and illustrations used by counsel, the ready, and, indeed, inevitable answer is, that the question thus presented ought no longer to be regarded as an open question. There is a reserved, and, at the same time, well recognized power, affecting their domestic concerns, remaining in all the States, which the government of the United States can not, and has seldom attempted to invade. This power is so varied and comprehensive that an exact definition, as applicable to all its phases, has so far been found to be impracticable, but the instances in which the existence of such a power has been judicially recognized, in particular cases, are quite numerous, as well as various in their application to our complex system of government. This reserved power is usually, though perhaps not always accurately, denominated the police power of a State, and embraces the en-

tire system of internal State regulation, having in view not only the preservation of public order and the prevention of offences against the State, but also the promotion of such intercourse between the inhabitants of the State as is calculated to prevent a conflict of rights, and to promote the interests of all.   Cooley Const. Lim. 572.

It is a power inherent in every sovereignty, and is, in its broadest sense, nothing more than the power of a State to govern men and things within the limits of its own dominion.   *License Cases*, 5 How. 504, 582.

It extends to the protection of the lives, limbs, health, comfort and convenience, as well as the property, of all persons within the State.   It authorizes the Legislature to prescribe the mode and manner in which every one may so use his own as not to injure others, and to do whatever is necessary to promote the public welfare, not inconsistent with its own organic law.   *Thorpe* v. *R. & B. R. R. Co.*, 27 Vt. 140.

In 1867 letters patent were issued to one DeWitt for a discovery in the manufacture of a quality of oil known as "Aurora Oil," and one Patterson became the assignee of the right conferred upon DeWitt by his letters patent.   Under a system of inspection provided by the laws of Kentucky, some casks containing this Aurora oil were branded "unsafe for illuminating purposes," and notwithstanding a statute of that State making it a penal offence to sell oil thus branded, Patterson sold the casks of oil in question to one Davis.   Patterson was thereupon indicted, tried and convicted in one of the Kentucky courts for the alleged unlawful sale of these condemned casks of oil.   This judgment convicting Patterson of a criminal offence having been affirmed by the Court of Appeals of that State, the cause was taken to the Supreme Court of the United States to test the validity of the statute under which Patterson was so convicted, as a restraint upon the sale of a commodity covered by letters patent from the United States.   Upon a review of all the questions involved, the validity of the statute was maintained, and the judgment

of the Court of Appeals was in all things affirmed. See *Patterson* v. *Kentucky*, 97 U. S. 501. ·

The court held in that case, and as we have no doubt correctly, that all that the letters patent secured was the exclusive right in the discovery, and that the right thus secured was an incorporeal right, and hence without " tangible substance ; " that the right to sell the oil was not derived from the letters patent, but existed and could have been exercised before the issuing of such letters, unless prohibited by some local statute ; that because the patentee acquired a monopoly in his discovery, and was hence secure against interference, it did not follow that the tangible property which came into existence by the application of the discovery was beyond the control of State legislation ; that, on the contrary, the right of property in the physical substance, which is the fruit of the discovery, is altogether distinct from the discovery itself, just as the property in the instruments or plate by which copies of a map are multiplied is distinct from the copyright itself ; that hence the right conferred upon the patentee and his assigns to make, use and vend the corporeal article or commodity brought into existence by the application of the patented discovery must be exercised in subordination to the police or local regulations established by the State. The doctrine of that case was approved and followed in the more recent case of *Webber* v. *Virginia*, 103 U. S. 344, and has the support, either in direct terms or in principle, of numerous other carefully considered cases. *Patterson* v. *Commonwealth*, 11 Bush, 311 (21 Am. R. 220) ; *State* v. *Telephone Co.*, 36 Ohio St. 296 (38 Am. R. 583, and note) ; *Jordan* v. *Dayton*, 4 Ohio, 295 ; *Fry* v. *State*, 63 Ind. 552 ; *People* v. *Russell*, 49 Mich. 617 (43 Am. R. 478) ; *Thompson* v. *Staats*, 15 Wend. 395 ; *Martinetti* v. *Maguire*, Deady, 216 ; *Vannini* v. *Paine*, 1 Harrington, 65 ; *License Tax Cases*, 5 Wall. 462 ; *United States* v. *De Witt*, 9 Wall. 41 ; *Railroad Co.* v. *Husen*, 95 U. S. 465 ; *Beer Co.* v. *Massachusetts*, 97 U. S. 25 ; *Brechbill* v. *Randall*, 102 Ind. 528 (52 Am. R. 695) ; *Palmer*

v. *State*, 39 Ohio St. 236 (48 Am. R. 429); *Western U. Tel. Co.* v. *Pendleton*, 95 Ind. 12 (48 Am. R. 692); *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650.

While, therefore, it is true that letters patent confer upon the patentee a monopoly to the extent of vesting in him, his heirs and assigns, the exclusive right to make, use and vend the tangible property brought into existence by a practical application of the discovery covered by the letters patent, for a limited time, it is not true that such exclusive right authorizes the making, using or vending of such tangible property in a manner which would be unlawful except for such letters patent, and independently of State legislation and State control.

It is next contended that the Central Union Telephone Company was organized, and has so far been conducted as an ordinary business investment, and is in its methods, as well as in its relations to its patrons and subscribers, a merely private enterprise, no more subject to legislative control than any other private business with which a considerable number of persons have become either directly or indirectly connected; that consequently the act of the Legislature, under which this prosecution was instituted, is inoperative and void as a restraint upon the company in its charges for the rental and use of its instruments.

The telephone is one of the remarkable productions of the present century, and, although its discovery is of recent date, it has been in use long enough to have attained well defined relations to the general public. It has become as much a matter of public convenience and of public necessity as were the stage coach and sailing vessel a hundred years ago, or as the steamboat, the railroad and the telegraph have become in later years. It has already become an important instrument of commerce. No other known device can supply the extraordinary facilities which it affords. It may, therefore, be regarded, when relatively considered, as an indispensable

instrument of commerce. The relations which it has assumed towards the public make it a common carrier of news, a common carrier in the sense in which the telegraph is a common carrier, and impose upon it certain well defined obligations of a public character. All the instruments and appliances used by a telephone company in the prosecution of its business are consequently, in legal contemplation, devoted to a public use. *State, ex rel.*, v. *Nebraska Telephone Co.*, 22 N. W. Rep. 237; 22 Cent. Law Jour. 33; *State of Missouri* v. *Bell Telephone Co.*, 23 Fed. Rep. 539; *State* v. *Telephone Co.*, *supra; American Rapid Tel. Co.* v. *Connecticut Telephone Co.*, 44 Am. R. 237, n.

It is now a well settled legal proposition that property thus devoted to a public use becomes a legitimate subject of legislative regulation and control. In recognition of that doctrine the case of *Munn* v. *Illinois*, 94 U. S. 113, has become a leading case.

It was, in general terms, held in that case, that when the owner of property devotes it to a use in which the public has an interest, he in effect grants to the public an interest in such use, and must, to the extent of that interest, submit to be controlled by the public, for the common good, as long as he maintains the use to which he has so devoted his property, and that he can only escape such public control by withdrawing his grant and discontinuing the use. In support of that conclusion, the court said it has been customary in England from time immemorial, and in this country from its first colonization, to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, innkeepers, and the like, and, in so doing, to fix a maximum of charges to be made for services rendered, accommodations extended and articles sold. This case has been the subject of much unfriendly comment and has encountered some very sharp criticism, but its authority as a precedent remains unshaken.

This State regulation and control of property devoted to a public use is not the *taking* of property for a public pur-

Hockett v. The State.

pose within the meaning of section 21 of article 1 of the Constitution of this State. Nor is such regulation and control an interference with the guaranteed rights of the citizen in private property. As bearing generally upon the subjects lastly above referred to, see, also, the cases of *Chicago, etc., R. R. Co.* v. *Iowa*, 94 U. S. 155; *Chicago, etc., R. R. Co.* v. *Ackley*, 94 U. S. 179; *Winona, etc., R. R. Co.* v. *Blake*, 94 U. S. 180; *Railroad Co.* v. *Richmond*, 96 U. S. 521; *Railroad Co.* v. *Fuller*, 17 Wall. 560; *Olcott* v. *Supervisors*, 16 Wall. 678; *Ruggles* v. *Illinois*, 108 U. S. 526; *Spring Valley Water Works* v. *Schottler*, 110 U. S. 347; *Ruggles* v. *People*, 91 Ill. 256; *Illinois Central R. R. Co.* v. *People*, 108 U. S. 541; S. C., 1 A. & E. R. R. Cas. 188; *Allnutt* v. *Inglis*, 12 East, 527; *Mayor, etc., of Mobile* v. *Yuille*, 3 Ala. 137; *N. J. Steam Nav. Co.* v. *Merchants' Bank*, 6 How. 343; *Bolt* v. *Stennett*, 8 T. R. 606; *Com.* v. *Duane*, 98 Mass. 1; *Com.* v. *Tewksbury*, 11 Met. 55; *Com.* v. *Alger*, 7 Cush. 53; *Metropolitan Board* v. *Barrie*, 34 N. Y. 657; *Slaughter-House Cases*, 16 Wall. 36; *Sharpless* v. *Mayor, etc.*, 21 Pa. St. 147; *Grant* v. *Courter*, 24 Barb. 232; *Bartemeyer* v. *Iowa*, 18 Wall. 129; *Beer Co.* v. *Mass., supra; Ogden* v. *Saunders*, 12 Wheat. 212; *Standard Oil Co.* v. *Combs*, 96 Ind. 179 (49 Am. R. 156); *Western U. Tel. Co.* v. *Pendleton, supra; Indianapolis, etc., R. R. Co.* v. *Kercheval*, 16 Ind. 84; *Foster* v. *Kansas*, 112 U. S. 201; *Brechbill* v. *Randall*, 102 Ind. 528; *Fry* v. *State, supra; Toledo Agr'l Works* v. *Work*, 70 Ind. 253; *West Virginia, etc., Co.* v. *Volcanic Oil Co.*, 5 W. Va. 382; *State* v. *Perry*, 5 Jones L. 252; *Attorney General* v. *Railroad Companies*, 35 Wis. 425.

The obvious deduction from what has been said, as well as from the authorities cited, is, that the power of a State Legislature to prescribe the maximum charges which a telephone company may make for services rendered, facilities afforded, or articles of property furnished for use in its business, is plenary and complete.

It was made to appear by the evidence that there are sev-

eral instruments more or less in use by telephone companies, each known as a "telephone," one as the hand telephone, another as the box telephone, a third as the switchman's head telephone, and the fourth as the battery transmitting telephone; that the first, known also as the Bell hand or magneto telephone, consists of a bar magnet with a helix of wire at one end, a diaphragm suitably mounted in front of the helix, and a hard rubber case supporting the whole, with combined poles for making connection with a cord from twenty-four to thirty inches long, and through it with a magneto bell; that this telephone will both transmit and receive sounds or words carried electrically over a connecting wire; that this instrument was at first, with the assistance only of the magneto or call bell, used in transmitting as well as in receiving telephonic messages; that some time after this Bell hand telephone had thus come into use, the battery transmitting telephone, known as the Blake transmitter, was introduced and generally accepted as a very decided improvement in the transmission of words and sounds over wires used by telephone companies, words and sounds being transmitted through it in a louder tone and with greater effect than through the Bell hand telephone; that for some time previous to the 13th day of April, 1885, this Blake transmitter had come into general use in the transmission of messages with that class of patrons and subscribers who desired the best available telephonic service; that since the Blake transmitter had come into general use as stated, the Bell hand telephone had been chiefly used as a receiver of messages, only a comparatively few persons continuing to use it also for transmitting purposes; that, on the day last·named, and for a considerable time previously, a fully equipped organization for the convenient and ready transmission and reception of messages over telephonic wires, consisted, as it still consists, of a Bell hand telephone and cord, a Blake transmitter, a magneto or call bell, a cell of battery, a backboard and a battery box; that the instru-

ments thus constituting a telephonic equipment have been and still are only rented by telephone companies to their patrons and subscribers, the latter not being allowed to either purchase or own any of such instruments.

Upon the facts thus disclosed by the evidence, it is, in the third place, contended that the act of April 13th, 1885, under consideration, only limits the price to be charged to three dollars per month when one instrument, known as a telephone, is rented to a patron or subscriber, and does not apply to a case like the one before us, where two instruments, each answering to that name, are, for his greater convenience, rented to the same person to be used together, and that consequently the facts of this case do not bring it within the penal provisions of that act.

In a general sense, the name " telephone" applies to any instrument or apparatus which transmits sound beyond the limits of ordinary audibility. The speaking tube used in conveying the sound of the voice from one room to another in large buildings, or a stretched cord or wire attached to vibrating membranes or discs, by which the voice is carried to a distant point, is, strictly speaking, a telephone. But since the recent discoveries in telephony, the name is technically and primarily restricted to an instrument or device which transmits sound by means of electricity and wires similar to telegraphic wires. In a secondary sense, however, being the sense in which it is most commonly understood, the word " telephone " constitutes a generic term, having reference generally to the art of telephony as an institution, but more particularly to the apparatus, as an entirety, ordinarily used in the transmission, as well as in the reception, of telephonic messages. In this latter sense, the Central Union Telephone Company, in behalf of which the appellant stands as the representative in this proceeding, has very significantly sanctioned the use of the word " telephone."

In August, 1885, it published a book for the use of its patrons and subscribers, entitled " Indianapolis Telephone

Directory," in which those having the use of its telephonic instruments were instructed as follows:

" Call by numbers.

" When through talking ring out.

•" Make all complaints to the chief operator—call No. 1,000.

" Help each other by answering your telephone promptly.

" Do not allow non-subscribers to use your telephone. It is unjust to other subscribers, impedes the service, and is a violation of your contract."

These were a substantial repetition of instructions issued by the Western Telephone Company, one of the predecessors of the Central Union Telephone Company, in June, 1883. In these instructions the " telephone " is plainly referred to as an organized apparatus—an institution—and not as a single instrument. In this use of the word " telephone," the telephone companies in question simply adopted and emphasized what had already been generally accepted as the proper meaning of that word in the connection in which it was so used by them.

Before the great discovery of Prof. Morse in telegraphy, the power of electricity to give a sudden and mysterious impulse to a suspended wire was well understood among those most familiar with experiments in electrical science. His discovery consisted in the invention of an instrument, or machine, which utilized that power of electricity, and thereby enabled him to send intelligible messages over suspended wires to remotely distant places. When that instrument, or machine, first came into use, the word " telegraph " was understood to more particularly refer to it as the thing best known by that name; but since that time a much wider and more comprehensive meaning has been attached to that word.

The " telegraph " is now usually accepted, and in common parlance is generally understood, as referring to the entire system of appliances used in the transmission of telegraphic messages by electricity, consisting of: *First.* A battery or

Hockett v. The State.

other source of electric power; *Secondly.* Of a line-wire or conductor for conveying the electric current from one station to another; *Thirdly.* Of the apparatus for transmitting, interrupting, and, if necessary, reversing the electric current at pleasure; and *Fourthly.* Of the indicator or signalizing instrument. See Imperial Dictionary, title "Telegraph."

In the respect indicated, the varying meanings of the word "telephone" are analogous to those applied to the word "telegraph," there being very much in common between the two systems of telephony and telegraphy. In reaching a conclusion as to what is generally understood by the use of the word "telephone," we have been governed partly by the information judicially within our reach, and in other respects by the evidence. The word having become a term of art, evidence was admissible to explain its proper meaning. 1 Greenl. Ev., section 280; Whart. Ev., section 961 to 972.

In view of the condition of things as shown to have existed on the 13th day of April, 1885, we feel constrained to hold that the word "telephone," as used in the act of that date, was intended to designate, and in fact really referred to an apparatus composed of all the usual and necessary instruments for the convenient and ready transmission and reception of telephonic messages, and not to a single instrument only.

There was evidence at the trial tending to prove that the Central Union Telephone Company can not supply the facilities to Haughey provided for in its contract with him for three dollars per month, without actual and very serious loss, and, arguing that the Legislature can not be presumed to have intended to inflict injustice upon any person or corporation, it is insisted we ought to take the company's liability to sustain a great loss in a certain contingency into consideration in determining the legislative intention in enacting the statute in question in this case. This argument is largely based upon the assumption that the company was not at liberty to decline to extend its line to Haughey's farm upon his

request that such ·an extension should be made, and that it will be compelled to maintain such extension so long as Haughey may require it to be maintained, independently of any contract with him on the subject. This assumption is, however, not well founded. There is nothing in the act of the Legislature under review, or contained in any other statutory or common law regulation applicable to the subject, to which our attention has been called, which requires a telephone company to construct a new line against its will or to maintain an old line longer than it may feel inclined to do so in the exercise of a legitimate business discretion. Besides, the power of the Legislature to pass the act in question being conceded, this court can not sit in judgment upon either the justice or the expediency of the enactment of such a law. If the law shall prove to be either unjust or inexpedient in its operation, whether upon persons or corporations, the appeal must be to the Legislature and not to the courts. 20 Cent. Law Jour. 83.

The judgment is affirmed, with costs.

