No. 1,645.

## CENTRAL UNION TELEPHONE COMPANY *v.* SWOVELAND.

TELEPHONE COMPANY.— *Toll Service.*— *Duty to Send Messenger for Person Wanted at the Telephone.*—A telephone company is required, under the toll service, to send a messenger for a person wanted at the telephone, if he lives within a reasonable distance from the receiving station, under section 5529, R. S. 1894, making it the duty of a telephone company, within its local limits, to supply applicants with telephone connections and facilities without discrimination, if they comply with its reasonable regulations.

SAME.—*Contract Against Its Own Negligence.*—The rule that a common carrier cannot relieve itself by contract from liability, on account of its own negligence, applies to telephone companies as well as to common carriers.

SAME.—*Duty to Serve the Public Impartially and with Diligence.*— The rule that common carriers are bound to serve the public with impartiality and diligence in the discharge of their duties, applies also to telephone companies.

SAME.—*Rules and Regulations.*—*Agent.*—*Messenger.*—A regulation by a telephone company that it will not undertake to deliver messages, and that any person who assists in conversation does so as the agent of the patron and not of the company, does not relieve it from liability to send a messenger as its own agent to notify a person within reasonable distance, that he is wanted at the telephone.

MAXIM.,—*Damages.*—*Cause.*—*Causa proxima non remota spectatur.*

EVIDENCE.—*Veterinary Surgeon.*—*Sick Animal.*—*Damages.*—*Proximate Cause.*—*Telephone Company.*—Evidence by a veterinary surgeon that plaintiff's mare died of colic, and that if he had arrived as soon as he might have done, except for the negligence of defendant telephone company in calling him to the telephone, the chances would have been in favor of his saving her, but that he cannot say positively that he could have done so, is insufficient to sustain a verdict for the loss of the horse.

From the Blackford Circuit Court.

*Bayless, Guenther & Clark,* for appellant.

*Cantwell, Cantwell & Simmons,* for appellee.

REINHARD, J.—The appellee brought this action

against the appellant in the court below for damages. The complaint is in two paragraphs. In the first paragraph, the appellee sought to recover the statutory penalty for failure to supply appellee with telephone connections and facilities without discrimination or partiality. During the progress of the trial, the first paragraph of the complaint was dismissed.

The second paragraph is as follows: "For a second and further cause of action, the plaintiff, complaining of the defendant, says: that, on the 20th day of April, 1893, the defendant was, and for a long time prior thereto had been, and still is, a telephone company with wires partly within said State, and engaged in a general telephone business and in furnishing telephone connections and facilities for the public generally for hire; and that the defendant at such times had, and still has, a line of telephone wires extending from the town of Hartford City to the town of Montpelier, in said county, and had at each of said places agents employed for the purpose of supplying the public generally with telephone connections and facilities for hire, and that as a part of the business of the defendant at said places it also undertook and agreed, for a compensation to be agreed upon before the performance of the service, to send messengers for such persons as anyone might desire to communicate with through such telephone; that, on said day, the plaintiff was the owner of a very fine horse, which was then and there reasonably worth, and was of the value of $150.00, and that on the morning of said day said horse became sick; that one Ithamer Rhine was then and there a veterinary surgeon residing in the said town of Hartford City, and having his place of business in said town, and within less than one-eighth of a mile of the defendant's telephone office in said Hartford City; that on the morning

of said day, and after his said horse became sick, the plaintiff, then desiring the services of said Rhine in the treatment of his said horse, and desiring to communicate with him by telephone and to inform him of the sickness of his said horse and of his desire to secure the services of said Rhine to at once visit and treat his said horse, called at the office of the defendant in said town of Montpelier, during the usual business hours of the defendant at said town of Montpelier, and Hartford City, to-wit, at half past seven o'clock in the afternoon, and notified defendant's agent at said Montpelier, Indiana, that he desired to at once communicate with Ithamer Rhine, a veterinary surgeon at said Hartford City, and that he also desired to have a messenger sent at once for said Rhine by the defendant's agent at said Hartford City, and further stated to said agent that it was very important that he should communicate with said Rhine at once, as that he (the plaintiff) had a very sick horse which he desired said Rhine to visit and treat; and the defendant, by its said agent at said Montpelier, then and there agreed with the plaintiff that for the sum of thirty-five cents, to be paid by the plaintiff, the defendant would at once send a messenger from the defendant's office at Hartford City for said Rhine, and that the plaintiff would have the privilege of communicating with said Rhine over the defendant's said wires, which said sum the plaintiff offered to pay, and did pay the defendant; but the plaintiff says that the defendant failed and neglected to at once send a messenger for said Rhine as agreed, and continued to fail and neglect to send for him for the space of five (5) hours, although said Rhine and his said place of business were well-known to the defendant's said agent at Hartford City, and although said Rhine was, during all of the said time, at his said place of business. The plaintiff further

avers that his said horse was at said time within one mile of said town of Montpelier, and that said Montpelier and Hartford City were each on the line of railway known as the Ft. Wayne, Cincinnati and Louisville Railroad, and were but ten (10) miles apart; and that the regular passenger train from said Hartford City to said Montpelier passed through said town of Hartford City at ten o'clock on said morning and arrived at said Montpelier fifteen minutes thereafter, and the plaintiff further avers that if the defendant's said agent at Hartford City had sent its messenger for said Rhine as agreed, the plaintiff could and would have communicated with him in time to have enabled said Rhine to arrive at said Montpelier on said morning train, and that said Rhine could and would have been able to visit and to treat his said horse in time to have saved its life; and that if said Rhine had arrived on said train he could and would have saved the life of said horse, but that owing to the failure of the defendant to send its messenger for said Rhine as agreed, said Rhine did not receive word that the plaintiff desired to communicate with him until twelve o'clock of said day; and that although said Rhine at once attempted to reach said horse in time to treat it, he did not arrive until after the death of said horse. Plaintiff says that he did all in his power to save the life of said horse, but that owing to the absence of anyone skilled in the art of veterinary surgery said horse died before the arrival of said surgeon. Wherefore the plaintiff demands judgment against the defendant, on this paragraph of complaint, for the sum of $150, and in all for $250, and for all other proper relief."

To the foregoing paragraph of the complaint the appellant filed a demurrer on the ground of the insufficiency of said paragraph to constitute a cause of ac-

tion.   The demurrer was overruled and the appellant excepted.  Appellant filed an answer in two paragraphs, the first of which was the general denial.    The second paragraph of the answer reads as follows :

''For further and second paragraph of answer to each paragraph of plaintiff's complaint, defendant says that it admits that it is a telephone company, and had on said 20th day of April, 1893, telephone wires extending from Hartford City, in said county, to Montpelier, and had at each of said places agents with duties prescribed by the rules and regulations of said company.   Defendant avers that at both said local offices at Hartford City and at Montpelier, it had posted in a conspicuous place therein, a special notice to the public, printed in plain and concise language, containing certain rules and regulations for the use of the patrons of said office, and those desiring to transmit messages through its telephone, and has had the same printed and posted as aforesaid for a long time, to-wit, five years, a copy of which special notice to the public and rules and regulations, marked 'Exhibit A' is herewith filed and made a part of this paragraph of answer;  that by the said notice to the public, which was printed and posted in said offices at said time as aforesaid, it was provided that the patrons of defendant should be present personally at the time the communication is had by the parties and principals desiring to use telephones;  that the defendant did not undertake to transmit and  deliver messages, and would not be responsible for such business, and that any person assisting in the conversation would do so as the agent and employe of the patron and not of the defendant;  that said printed notice in the office of defendant at Montpelier, Indiana, was printed on a card in large, legible type, and was posted in a conspicuous place where the same could be seen by the pub-

lic and by the plaintiff herein, and the same was seen
and read by the plaintiff herein; that defendant admits
that plaintiff called at its office in the town of Mont-
pelier on said date, but it alleges that plaintiff left,
with defendant's agent thereat, a verbal message, as
set forth in each paragraph of complaint, and there-
upon left and departed from said town of Montpelier,
Indiana, with instructions to defendant's agent thereat
to deliver the said message through defendant's agent
at Hartford City, Indiana, to said veterinary surgeon;
that when plaintiff left said town of Montpelier, and
informed and left the said message with the agent of
defendant of said town, that the said agent at Mont-
pelier, Indiana, as well as the agent at Hartford City,
in the matter of delivery of said message to said veter-
inary surgeon, by said rules and regulations of said de-
fendant, and which plaintiff well knew, became and were
thereby constituted, appointed and were the agents of
plaintiff herein as the patron of the defendant, and 'in
nowise defendant's agent in said matter.'

"Defendant avers that when said veterinary surgeon
received the said message and the same was delivered
to him he received the same from the agent of the
plaintiff, and not from the agent of this defendant; that
under the said rules and regulations of this defendant,
it did not undertake to deliver said message or any
message out of its office; that at the time the operator
and agent at Hartford City undertook and agreed to
deliver said message to said veterinary surgeon, he did
so under an express employment with the plaintiff for
a consideration of ten cents and solely as the agent of
the plaintiff and not in any way or manner as agent of
this defendant.

"Defendant avers that it did not use any discrimina-
tion against the plaintiff, nor did it intend doing so,

and that by reason of the failure of the plaintiff to be present and communicate with the said veterinary surgeon personally, and as required by its reasonable and printed rules and regulations, the said message was delivered by his (plaintiff's) agent, and that any delay in consequence thereof was done or caused to be done by defendant (plaintiff). Wherefore defendant demands judgment for costs."

With the foregoing pleading, the appellant filed what is designated as "Exhibit A," but as this paper is set out *in hœc verba* in the next paragraph of answer, we omit it here.

Afterward the appellant filed a third paragraph of answer which is as follows:

"Comes now the defendant, and for a third and additional paragraph of an answer to the plaintiff's complaint and to each paragraph thereof and says that it admits that on the 20th day of April, 1893, and for a long time prior thereto, it had been and still is a corporation owning and operating a telephone line with wires and telephone instruments within the State of Indiana, and was engaged in the general telephone business in furnishing telephone connections for its subscribers and the public for hire; that it had a telephone wire extending from the town of Hartford City to the town of Montpelier, in said Blackford county, Indiana, and at each of said places had an agent employed for the purpose of attending said telephone instruments and providing for telephone connection and facilities. Defendant says that the sole duty of its said agent was to attend the said instruments and collect the fixed charges for the use of its instruments by the public and its patrons; that as such corporation, it had adopted certain rules for the management and conducting of its business, which rules were necessary and reasonable ones; that at the date

alleged in said plaintiff's complaint, and in each para-graph thereof, the said defendant had posted in a con-spicuous place in its office and rooms in the said town of Montpelier and the said town of Hartford City, where its said telephone instruments were located, a large poster, printed in large, plain type, printed upon a card-board, its rules and 'Special Notice to the Public,' which rules and notice were in the words and figures, to-wit:

" ' Form 48 A.

" ' CENTRAL UNION TELEPHONE COMPANY.

" ' Special Notice to the Public.

" 'Frequent applications are made to this company's employes for the transmission and delivery of verbal messages for toll line patrons; but while the company desires to afford every practicable accommodation to the public, the use of its lines is authorized only for patrons personally, the principals to a communication being present at the telephone. The company does not under-take to transmit and deliver messages, and will not be responsible for such business. Any person who assists conversations does so as the agent or employe of the patron and not of the telephone company. No refund will be allowed unless claimed within twenty-four hours after an unsatisfactory service. The company's adver-tised rate for toll service covers in each case but one connection and retention of the line not to exceed five minutes. An additional charge at the same rate will be made for each successive period of five minutes or fractional part thereof.

F. G. BEACH, Gen'l Supt.

Chicago, December 1, 1888.'

" Defendant further says that its said agent at the

town of Montpelier, in communicating the plaintiff's message to the said agent at Hartford City, was not the agent of this defendant, but was for that purpose the agent of the plaintiff, and that its agent at Hartford City, in receiving said message, did so solely as the agent of the plaintiff and was not in that matter the agent of this defendant.

"Defendant further says that in delivering messages received over its wires and by its telephone instruments the same is taken by the messenger as the agent of the patron, the person sending the same, under such arrangement as may be effected between such persons, and not as the agent of the defendant; that the said agent at Hartford City, in undertaking or agreeing to deliver the plaintiff's message to said veterinary surgeon, did so between the plaintiff and the said agent at Hartford City at twenty-five cents; that the defendant, under its rules and regulations, received no part or parcel of the fee in compensation paid for the delivery of the message from its offices, and had no interest whatever therein; but that said fee and consideration belongs wholly to the person whom the patrons or plaintiff may employ for such service.

"Defendant further says that the acts of negligence charged in the plaintiff's complaint, and in each paragraph thereof, were solely the negligence and default, if there was any, of the plaintiff's agent who, in the performance of said service, or failure to perform the same, or in his agreement to render such message service, was acting solely as plaintiff's agent.

"Wherefore, defendant asks judgment for its costs."

To each of the foregoing answers appellee filed a demurrer, which was by the court sustained and proper exceptions were taken. The cause was twice tried by a jury, the last time resulting in a verdict in favor of the

appellee, upon which judgment was rendered over appellant's motion for a new trial.

The questions presented by the record arise on the ruling of the trial court in overruling the demurrer to the second paragraph of the complaint, in sustaining the demurrer to the second and third paragraphs of the answer, and in overruling the motion for a new trial.

Appellant has assigned many reasons for a new trial, among which are the giving of certain instructions, the refusal to give others, and the giving of still others as modified; the insufficiency of the evidence to sustain the verdict, and that the damages assessed are excessive. Following the method of discussion adopted by appellant's counsel, we shall notice the several alleged erroneous rulings together.

The first contention of appellant's counsel is that "it was not a duty of the appellant company to furnish messenger service to notify the person with whom the appellee desired to communicate that he was wanted at the telephone."

Counsel on both sides agree that the exact question here presented has never been decided in this State, and we may add that so far as we are informed it has never been decided by any court of last resort. The question is therefore of more than ordinary importance.

The telephone is a new and modern invention and the adjudicated cases concerning it are comparatively few. In many respects it serves the same purpose as the telegraph, and yet in other particulars it serves different purposes. Telegraph companies are sometimes regarded by the law as common carriers for the purpose of transmitting and delivering messages from one point to another. Like common carriers of freight and passengers, telegraph companies have certain public duties to perform toward those with whom they transact business.

The law defines those duties and demands their performance regardless of the contract that may be entered into between them and their patrons. Thus, while a common carrier may contract for exemption from liability for certain acts, it never can relieve itself from such liability by contract on account of its own negligence. This rule applies with equal force to telegraph and telephone companies.

The telegraph is an instrumentality of such a public character, as to justify in its behalf the exercise of the right of eminent domain; and the same is true of the telephone, where it is not wholly a private affair, the use of which is denied to the public. *State Trent. and New Bruns. Turnp. Co.* v. *American, etc., News Co.,* 43 N. J. L. 381. Both telegraph and telephone companies are engaged in business connected with the public interest, and hence the State is authorized in a large measure to dictate the manner and terms of transacting such business. While it may be true, that telegraph and telephone companies do not occupy the exact legal status of common carriers of passengers and freight, yet they bear a strong analogy to these. Thus, the rule which applies to common carriers, that although they may not be insurers, yet they are bound to serve the public with impartiality and diligence in the discharge of their duties, applies equally to telegraph and telephone companies. All such companies are *quasi* public servants, and the law makes it their duty to serve the public impartially and in good faith.

As we have seen, the object and purpose for which telegraph companies exist is the transmission of messages from one person to another by means of certain electric wires and instruments. Incidental to their service is the delivery within reasonable limits of the messages

which they undertake to transmit. Telephone companies exist not so much for the purpose of conveying messages as to afford their patrons who may desire to do so the opportunity of carrying on a conversation with each other. This is done also by means of electric wires and instruments, but these, unlike the telegraph wires and instruments, afford the communication by means of transmitting sound beyond the limits of ordinary audibility.

The telephone, although of comparatively recent introduction into the business and commercial world, has become almost indispensable as a vehicle of public intelligence, and those who operate it are subject to all the legal duties and obligations devolving upon other *quasi* public servants, whether such duties and obligations arise from the common law or are created by the statutes of the State, or both. In our own State the statute makes it the duty of every telephone company, within its local limits, to supply applicants with telephone connections and facilities without discrimination or partiality, provided such applicants comply with the reasonable regulations of the company. Section 5529, R. S. 1894.

That such companies have the right to make reasonable regulations for the purpose of carrying on their business, is thus expressly recognized by the statute, but they have the right to do so independently of statutes. Such rules and regulations as they might adopt, however, must be reasonable and cannot have the effect of relieving the company of the duties and obligations, which it owes its patrons by means of its public character. 25 Am. and Eng. Ency. 755, *et seq*; *Cent. Union Telephone Co.* v. *State, ex rel.*, 118 Ind. 194. As was said by McBride, J., in the *City of Rushville* v. *Rushville Nat. Gas Co.*, 132 Ind. 575 (15 L. R. A.

321), at p. 584 :   "It is too well settled to be longer the subject of controversy, that where the owner of property devotes it to a use in which the public have an interest, he must, to the extent of the interest thus acquired by the public, submit to the control of such property by the public for the common good."

That telephone companies are regarded as *quasi* public servants in their relation to the State is thus tersely declared by Niblack, J., in *Hockett* v. *State*, 105 Ind. 250 (257) :

"The telephone is one of the remarkable productions of the present century, and, although its discovery is of recent date, it has been in use long enough to have attained well defined relations to the general public.   It has become as much a matter of public convenience and of public necessity as were the stage coach and sailing vessel a hundred years ago, or as the steamboat, the railroad and the telegraph have become in later years. It has already become an important instrument of commerce.   No other known device can supply the extraordinary facilities which it affords.   It may, therefore, be regarded, when relatively considered, as an indispensable instrument of commerce.   The relations which it has assumed towards the public make it a common carrier of news, a common carrier in the sense in which the telegraph is a common carrier, and impose upon it certain well defined obligations of a public character. All the instruments and appliances used by the telephone company in the prosecution of its business are consequently, in legal contemplation, devoted to a public use."

It is one of the appellant's regulations that it will not undertake to deliver messages, and that any person who

assists in conversation does so as the agent and employe of the patron and not of the company.

Assuming that the appellant had a right to make and enforce such a regulation, and that the same is reasonable and not against public policy, we do not think the complaint proceeds upon the theory that the appellant failed to deliver a message, but on the theory that appellant failed to notify Dr. Rhine at Hartford City that his presence was desired at the telephone.

There are two kinds of telephone service which the appellant has undertaken to perform for the public. One is accomplished by means of instruments placed in the residences or places of business of the patrons, for their private and personal enjoyment and benefit, and it needs no agent or messenger to carry such service into execution, except the operator of the central office. These instruments are furnished by the company in consideration of a fixed periodical rental, paid by the patron. The other is what is denominated as toll service, and is rendered by placing at the disposal of the patron at the transmitting station and the one at the receiving station, instruments connected by electric wires by means of which the two are enabled to carry on a conversation. To render the latter service effective, it is necessary, of course, that there should be some one at the receiving station ready to notify the person with whom it is desired by the patron at the transmitting station to converse, unless such person should himself be in possession of a telephone instrument at his residence or place of business which is connected with the main line. The person who is usually sent out to look up the party wanted at the instrument is called a messenger, and is generally, if not universally, supplied by the telephone company, for if the patron who desires to be placed in communication with the party at the receiving station

were himself required to send out and have such party brought to the station, and to the instrument, the service would be practically worthless to him.   Hence, we take it that it was a part of the duty of the appellant, in connection with its toll service, if Dr. Rhine resided within a reasonable distance from the station at Hartford City, to send a messenger to him and inform him that he was wanted at the telephone.   We are therefore of opinion that the person to whom was entrusted the duty of notifying Dr. Rhine that there was a call for him at the telephone, was the agent of the appellant and not of the appellee, and that within reasonable limits, the appellant is responsible for his acts and omissions, the same as a telegraph company would be for the conduct of its messenger to whom it had entrusted the delivery of a telegram.   If, therefore, the appellant had undertaken by its rules and regulations to exempt itself from liability for the conduct of such messenger, by providing that the latter should be regarded as the agent of the patron desired to be placed in communication with the patron at the receiving station, such a rule or regulation would be in violation of the duty the appellant owes to the public, and would be void.   But we do not interpret the rules promulgated by the company and relied upon here, as an attempt to escape liability for messenger service in proper cases, but as a provision that it will not undertake to transmit and deliver verbal messages beyond its telephone stations, which is quite a different matter.   The *gravamen* of the complaint here, however, is not the failure to deliver a verbal message, but the failure to bring Dr. Rhine to the telephone office so as to enable the appellee at Montpelier to be placed in telephone communication with him at Hartford City.   We grant that if the appellant had adopted a rule that it would not under-

take to call persons to the telephone whose place of business or residence was so remote from the station as to render it unreasonable that it should be required to find them, such a rule would be reasonable and could be enforced. Possibly appellant even without such a rule could not be required to send out for a person who is to be found at too great a distance from the station. But appellant does not deny its liability upon any such ground. Indeed, it is not contended that Dr. Rhine was not within a very short distance of the telephone station when he was called for by the appellee, and the only ground upon which the appellant seeks to avoid liability is that it is not responsible for the negligence of the messenger in calling Rhine. We do not think the appellant's position tenable and must hold that it was a part of its public duty, under the facts of this case, to place the parties in communication with each other within a reasonable time after its agents were informed of the nature of the service desired, and had undertaken, for a stipulated consideration, to furnish such service. The complaint is sufficient.

Moreover, it cannot be denied that in the present case the contract itself provided that the appellant should send a messenger for Rhine and bring him to the telephone; at least this is what the complaint alleges, and there is evidence tending to prove such allegation. If then the appellant undertook to perform such messenger service by the terms of its contract, and failed to do so, it would be liable for a violation of the contract, whether its duty to the public required it to render such service or not.

What we have said disposes also of the second point made by the appellant's counsel against the appellee's right of recovery, viz.: that appellant has the right to

adopt and promulgate reasonable rules and regulations for the management of its business.

The next and last contention of the appellant is that, even if it was the duty of appellant to send a messenger for the veterinary surgeon, and that it was guilty of negligence in the performance of this duty, the evidence does not show that such negligence was the proximate cause of the death of the horse; that the damages are too remote, speculative and conjectural, and that, therefore, the appellant was in no event entitled to recover.

It is argued in this connection that whether the life of the horse might have been saved had Dr. Rhine been promptly notified, is a matter of mere chance, conjecture and speculation.

The animal was a mare about eight years old, and was carrying a colt. She had been used in hauling up to the day before she died. About 4 o'clock in the morning, appellee went to the stable and found that the mare had foaled a colt. He returned to the house, and at 6 o'clock went back to the stable and found the mare in pain; that she would lie down, roll over and get up again; that she would raise her head and look back at her side, and was bloated in the flank at the hip-bone. About 6:30 o'clock, he went for a Mr. Howard, who sometimes treated sick horses, and who, after examining the animal, advised sending for Dr. Rhine, the veterinary surgeon of Hartford City. At about 7 o'clock, the appellee went to Montpelier to telephone for Dr. Rhine. The train at that time arrived at Montpelier from Hartford City about 9 o'clock A. M. Dr. Rhine reached appellee's residence at about 12:30 o'clock. Appellee returned home about 10 o'clock, and administered some medicine to the animal. The latter died just before Dr. Rhine arrived.

There was some evidence to show that the mare died of colic.    Dr. Rhine testified that he was not acquainted with the animal.    In answer to a hypothetical question assuming to describe the condition of the mare, he answered that to the best of his judgment the symptoms would indicate flatulent colic.    He then testified as follows :

"Quest.    If the mare was healthy prior to this time and had been taken with a spell of flatulent colic, and you had been present and treated her within four hours after she was taken sick, or even within five hours, you may tell the jury what in your judgment would have been the chances of the recovery of the horse? Ans.    Well, that would depend a good deal on the condition she was in at the end of five hours.    Some are worse at the end of five hours.

"Quest.    Supposing that the horse had taken sick at 6 o'clock in the morning, and that you had received notice at 8 o'clock the same morning, you may tell the jury whether, in your opinion, you would have been able to have reached the horse in time to have saved her life?    Ans.    Well, if it lasted her until half-past eleven I judge that she could have been saved.    The chances are she could have been saved.

"Quest.    Supposing in connection with that the horse did not receive any medical aid and lived until half-past twelve o'clock of that day, supposing that this is true, and the symptoms I have named, she having been healthy prior to that time, and you had reached the horse at half-past ten or eleven o'clock that day, would you have been able to have saved her life?    Ans.    The chances are that way.    I could not positively say.    But the chances would be in her favor.

Central Union Telephone Company *v.* Swovoland.

### CROSS-EXAMINATION.

"Quest. It is a matter of chance? Ans. Yes. There is a chance for her to die.

"Quest. You are not able to prevent all horses from dying that you doctor? Ans. No, sir.

"Quest. A great many of them die? Ans. Yes, sir.

"Quest. And you are not able to prevent their dying? Ans. Yes, sir.

\* \* \* \* \* \* \* \* \* \* \*

"Quest. Well, now, when you got there, this mare was dead and hauled away? Ans. Yes, sir.

"Quest. Did you see her? Ans. No.

"Quest. Did not make any examination of her? Ans. No, sir.

"Quest. All you know about her symptoms is what you have been told by other parties? Ans. Yes, sir.

"Quest. None of these parties pretend to be veterinary surgeons that told you? Ans. No, sir.

"Quest. You have diagnosed the case on what somebody has told you, and not from your own observation? Ans. Yes, sir.

"Quest. You say you might have cured her, and you might not? Ans. Yes.

"Quest. You cannot say to this jury that you would have saved this mare? Ans. No, sir.

"Quest. There are other ailments that affect horses besides flatulent colic? Ans. Quite a good deal.

"Quest. That is only one of many troubles that you have to contend with? Ans. One of many.

"Quest. And the risk of life is greater in a brood mare than in a gelding? Ans. It is in a general way.

"Quest. Is not the rate of insurance higher? Ans. Yes, sir.

"Quest. Sometimes they die during the time they are in foal? Ans. Yes, sir.

"Quest. And you simply say to this jury, that if it was flatulent colic that was the matter with this mare, and had you been there, that you might have saved her life? Ans. Yes, sir.

"Quest. But you cannot say positively that you would have saved it? Ans. Nothing, only the chances are.

"Quest. The chances favor that way? Ans. Yes, sir.

"Quest. But not certain? Ans. No, not certain."

There is no doubt about the correctness of the rule sought to be invoked by the appellant. No damages can be recovered in such an action as this that are not shown to be the direct and natural result of the negligence, and such as reasonable men would likely have contemplated in similar circumstances. Not only must the damages be the natural, ordinary and proximate result of the breach complained of, but they must be certain, both as to their nature and the cause from which they flow. Hence, mere speculative, contingent and conjectural damages are never allowed. Sutherland, Dam., section 963.

From what has been said it must be apparent that we have reached the conclusion that the appellant is liable to the appellee for such damages as are the necessary and direct result of the appellant's negligence in failing to call Dr. Rhine to the telephone within a reasonable time after the appellee's request therefor. The court instructed the jury that in case they found for the plaintiff the value of the horse would be the measure of his damages.

Appellee's counsel insist, and rightfully so, we think, that the same rule applies to the sending of messengers

Central Union Telephone Company v. Swoveland.

for persons wanted at the telephone, as applies to tele-
graph companies in sending and delivering messages, and
that where the company had knowledge of the impor-
tance of the message, it becomes chargeable with notice
of the loss likely to follow the failure to deliver the mes-
sage promptly; that it was the duty of the appellant with-
out delay to send its messenger to Dr. Rhine, and inform
him that he was wanted at the telephone we have
already decided.    Granting without deciding that the
company, from the information it had received of the
nature of the communication the appellee desired to
make to Dr. Rhine, was bound to take notice of the im-
portant and urgent character of the appellee's business
with the said Rhine, it still remains to be determined
whether there was any evidence from which the jury
could legitimately infer that the negligence of the appel-
lant in sending for Dr. Rhine was the proximate cause
of the death of appellee's mare, for the appellee's coun-
sel freely concede that the appellant is only liable for
such damages as proximately result from the negligent
delay.    Under   the   maxim   *causa   proxima   non
remota spectatur*,  the law will compensate only for
such damages as are the proximate consequence of the
alleged wrongful act and will not consider such as are
remote or speculative.    It is not sufficient that the
plaintiff's injury may possibly have resulted from the
defendant's act, but it must be shown to be the direct
and natural result of the same, and such as persons of
ordinary care and forethought would have contemplated
as a probable result of a breach when the contract was
made.    *City of Chicago* v. *Starr*, 42 Ill. 174; Shear.
and Redf. Negl., section 739; Pollock Torts, sections
36 and 37.

Thus, where a person sued a telegraph company for
failing to deliver a message announcing the severe ill-

ness of plaintiff's father, and sought to recover damages for the loss of a note which the plaintiff claimed his father would have given him had he been present at his bed-side just before his death, it was held too remote to be considered as a claim for damages. The court said:

"Perhaps his father would have given him the note. It would not, however, have been a natural consequence of his going to see him. He might, and he might not have done so. No such loss could have been contemplated by the parties to the sending of the message, had their minds at the time been drawn to the contingency of its not being delivered. * * * As well might one claim from a railroad company the amount of a stake in a race upon the ground that if the train had not been negligently delayed, his horse would have arrived in time and won the race." *Chapman* v. *Western Union Tel. Co.*, 90 Ky. 265.

A case like that supposed by the Kentucky court actually arose in Kansas, in which the owner of a race horse sought to recover from the telegraph company the stake-money which he would have won, but for the alleged negligence of such company in inaccurately transmitting a message. *Western Union Tel. Co.* v. *Crall*, 39 Kan. 580.

In another case the facts were, that the plaintiff signed and delivered to the defendant company the following message:

"R. meet me in C. Saturday night."

It was not delivered to R. and plaintiff brought an action against the company, alleging that by its negligence, he was put to expense in hiring a conveyance to go from C. to R.'s home and back again; that he failed to meet important engagements, and by reason of exposure he impaired his health greatly. It was held that

the damages were too remote. *Western Union Tel. Co.* v. *Smith*, 76 Tex. 253.

In another Texas case the plaintiff sought to recover damages of the telegraph company for bruises received in consequence of having to take a rough vehicle instead of the family carriage, for which plaintiff had telegraphed, the company having failed to deliver the message in time. It was held that the damages were too remote to make a valid claim against the company. *McAllen* v. *Western Union Tel. Co.*, 70 Tex. 243.

The case of *True* v. *Internat'l Tel. Co.*, 60 Me. 1, was an action to recover damages for the non-delivery by the defendant of a message by the plaintiff and given to the defendant for transmission. The message was in answer to one received by the plaintiff offering a cargo of corn at a specified price and accepting the offer. By reason of the non-delivery of the message, the plaintiff failed to obtain the corn, and the price of corn and of freight having immediately advanced, the plaintiff was obliged to buy other corn at higher prices.

In passing on the question of damages other than the amount paid for the transmission of the message, the court said : "These damages are disallowed, not because they cannot be traced directly as the immediate and undoubted effect of the breach, but because they are in their nature uncertain and contingent and perhaps more decidedly because they are not such as would naturally flow from the breach, and could not fairly be considered as having been within the contemplation of the parties at the time of entering into the contract. This rule necessarily excludes all remote, speculative and uncertain results, as well as possible profits, advantages and other like consequences, which might have arisen

or which it can be shown, would have arisen from the performance of the contract."

In *Megow* v. *Chicago, etc., R. W. Co.*, 56 N. W. Rep. 1099, which was an action to recover damages for the destruction of plaintiff's property by fire, the court held that a non-suit was properly granted, because the evidence left it a matter of conjecture whether the injury was caused by fire by defendant or by back fires, started to stop its progress. The court said: "If the case had been sent to the jury, they would have been left to guess at or conjecture a result, which the law requires should be fairly established by competent evidence."

The facts in the case of the *Western Union Tel. Co.* v. *Kendzora*, 13 S. W. Rep., p. 986 (Texas), were as follows: The plaintiff's wife being sick he sent a telegraphic message to a physician summoning him to her bedside, but the message was not delivered. The message was dated the 26th day of December, and the plaintiff's wife died on the morning of the 28th. The physician, previous to the sending of this dispatch, had promised the plaintiff to attend upon receiving a dispatch requesting him to do so. The plaintiff sought to recover damages for breach of the contract to deliver the message, alleging his damages to consist in the loss of his wife's services, and in mental suffering from that breach. The only evidence tending in any degree to show that the physician could have saved the life of the plaintiff's wife was, that plaintiff seeing that his wife was getting worse sent for the physician, believing that he could, by skill, save her life. The trial court charged the jury as follows: "'To authorize you to find for plaintiff for the loss of the services of his wife, you must believe from the evidence that such loss of services was occasioned by the failure of the defendant to transmit and deliver the message to said Dr. Haney; and unless

you so believe from the evidence, you will not find any-thing for the plaintiff for the loss of the services of his wife.'" The Supreme Court said: "We think the court erred in giving the charge quoted. * * * There was no evidence that should have been consid-ered by the jury tending to show that Mrs. Kendzora would not have died if the message had been promptly delivered. At the time of her death she had been sick three weeks; and, when Dr. Haney saw her, ten days before, she had typhoid pneumonia. In the state of the evidence before the jury, it was a mere matter of speculation whether she was not beyond the reach of human skill when the message was delivered to the company."

The facts in a comparatively recent case decided by the Supreme Court of Wisconsin, are very much like those in the case at bar. The action was brought to recover damages alleged to have been sustained by the plaintiff by the death of his horse, in consequence of the negligence of the defendant company in transmitting a message for the plaintiff from Westboro, Wisconsin, to Foster Bros., at Eau Claire, Wisconsin. The plaintiff's horse was sick December 4, 1889, at Westboro, with congestion of the lungs, and desiring the services of a veterinarian, he delivered to defendant's agent at that place a message to be transmitted as follows: "To Foster Bros., Proprietors, Eau Claire House, Eau Claire, Wisconsin. Please send a good horse-doctor on first train. John Duncan." As transmitted and de-livered the word "doctor" was omitted, and on account of the incorrect transmission of the message the plain-tiff could not get a competent person to treat and attend to his horse within the time necessary to save him; and from want thereof said horse died December 6, 1889. The evidence was to the effect that a veterinary sur-

geon from Eau Claire could have been secured so as to reach Westboro early in the morning of the 5th of December, if the message had been correctly transmitted. In the afternoon of the 5th the services of Dr. Wicker were secured, but the horse died about 1 o'clock on the morning of the 6th. Dr. Wicker testified to visiting the horse; that it had pneumonia; that he never studied medicine or graduated from any college; but practiced when called on, but not continuously. He was allowed to testify that, at the time he saw the horse, he told the plaintiff he could not save him; that the disease had gone too far; that the disease is not necessarily fatal in horses, but a delay of ten or twelve hours makes a great deal of difference. He was asked: "In usual cases in horses affected with this disease, if medical aid arrives within fifteen or sixteen hours after the horse is taken sick, do you consider that in time?" He answered: "It will be owing to the severity of the attack. I have had cases that ran three days without medical aid that recovered." He said it was a very hard question to answer, whether from the symptoms of the horse, as he saw them, if the proper treatment had been administered at 4 o'clock in the morning the horse could have been saved. He testified, considering that the horse was taken sick a little before noon of the 4th of December, in an ordinary case of this disease, he would think that proper treatment by 4 o'clock of the next morning would be in time; that he did not see anything extraordinary in this case from the usual run of cases he had treated; that he would not swear that the horse could have been saved, and did not think any one would; that the veterinary surgeon would have a better chance if he had been there at that time, than when he arrived. This is the substance of the testimony to show that the negligence of the defendant was

the proximate cause of the damages sustained by the plaintiff. The defendant moved for a non-suit on the ground that there was not sufficient proof that the plaintiff had suffered damage by reason of the defendant's negligence. The motion was denied, the cause submitted to the jury and a verdict given for $150.00, from which judgment the defendant appealed. Pinney, J., after stating the facts in substance as above given, said : "The evidence in this case was not sufficient to warrant the submission of the issues to the jury, and the motion for a non-suit ought to have been granted. The witness Wicker testified that when he saw the horse he thought he could not save it; that the disease had gone too far. He had no means of knowing whether it was an ordinary case of pneumonia at the time, in the morning of the 5th, when it is said a veterinary surgeon could have reached Westboro from Eau Claire, had the plaintiff's message been correctly transmitted. Any opinion given by him in that respect, as well as to whether the horse could have then been saved by treatment was the merest guess or conjecture, without any statement of facts to support or justify it. It is true he testified that he did not see anything extraordinary in this case from the usual run of cases he had treated. This, to say the least, is singular, in view of his former statement, in substance that when he saw the horse it was his opinion that the disease had gone so far that the horse could not be saved. Perhaps he meant that he did not see anything extraordinary in the case, as one that had progressed so far as this one had. However this may be, admitting that a veterinarian would have had a better chance to save the horse if he had been there at 4 o'clock in the morning than at 5 o'clock in the afternoon, when Wicker came, still it was but a chance. There was no competent evidence

to show that, at 4 o'clock in the morning, the case was an ordinary case of pneumonia. The most that can be said is that the evidence wholly fails to prove the issue, and affords a foundation only for the merest guess or conjecture, and the jury were left to guess and conjecture at a result which the law requires should have been fairly established by competent evidence.    *    * This is error. The judgment of the circuit court is reversed." *Duncan* v. *Western Union Tel. Co.*, 87 Wis. 173.

Other cases might be cited, but we do not deem it necessary to prolong this opinion. To say the least, the evidence did not warrant the jury in assessing any damages for the loss of the horse, as the same were too remote and conjectural. Whether the appellee is entitled to recover for any other item of damage we need not decide. We do not wish to be understood as holding that cases may not arise in which under similar circumstances it would be proper to submit the question as to whether the death of the animal may be traced to the negligence of the company, but we do not think there was any proper evidence in this case upon which the jury could base a verdict for damages by reason of the death of the horse.

The appellant was entitled to a new trial.

Judgment reversed.

Ross, J., concurs in the result reached, but not in all of the reasoning of REINHARD, J.

GAVIN, C. J., I very much doubt whether any duty rests upon telephone companies to send messengers for parties who are desired at the telephone, unless there be a contract to so do, or the company holds itself out to the world as ready to render this service.

Filed February 12, 1896.