FOLTZ, VAN CAMP HDW., ETC. CO. ET AL. *v.*
CITY OF INDIANAPOLIS ET AL.

[No. 29,293. Filed December 16, 1955.]

660

*Thomas M. Quinn, Joseph M. Howard, Merrill Moores,* of Indianapolis, for appellants, Gerald L. Foltz and Van Camp Hardware & Iron Co.

*Lewis C. Bose, Charles W. Cook, Jr.* and *Cook, Bose & Buchanan,* of Indianapolis, for other appellants.

· *George B. Davis,* of Greenfield, for appellant, John S. Elmore.

*James E. Rocap, John T. Rocap, Rocap, Rocap, Reese & Robb,* of Indianapolis, for appellant William F. Krieg.

*Earl C. Townsend, Jr.,* of Indianapolis, for appellants, Burford Danner and Helen D. Garrigues.

*Edwin K. Steers,* Attorney General, *George B. Jeffrey,* Deputy Attorney General, for appellee, Attorney General, State of Indiana.

*Palmer K. Ward,* Corporation Counsel, *Frank X. Haupt,* City Attorney, *Arthur H. Northrup,* Assistant City Attorney, Indianapolis, Indiana.

*Waldo C. Ging,* of Greenfield, for other appellees.

*Robert D. McCord, Harry T. Ice, David N. Brewer, Robert D. Risch,* and *Ross, McCord, Ice & Miller,* of Counsel, all of Indianapolis, for Indianapolis Civic Progress Association, Inc. Amicus Curiae.

ARTERBURN, J.—This is an appeal from a judgment in two suits consolidated in the lower court for trial. One suit was brought by appellant, Foltz, against the above named appellees, City of Indianapolis et al., and the other action was brought by Van Camp Hardware & Iron Co. against the same appellees. This litigation arises out of proceedings under the First-Class Cities Off-Street Parking Act, being Acts 1949, ch. 261, pp. 941, 962, (§§48-8421—48-8443), as amended, (§48-8430 Burns' 1950 Replacement [1955 Supp.]) (hereinafter referred to as the "Off-Street Parking Act)."

The Off-Street Parking Act, in brief, empowers the city through the Commission, to acquire real estate by condemnation proceedings and otherwise, and develop the property; lease, or sell it for off-street parking lots and buildings, and to issue bonds for the development of such off-street parking facilities. The object of the act states its purpose to be the reduction and relief of traffic congestion on the public streets.

The appellants in their complaints ask for a declaratory judgment that the acts of the City of Indianapolis, (hereinafter referred to as "City"), and the Indianapolis Off-Street Parking Commission and the Indianapolis Department of Off-Street Parking, (hereinafter referred to as "Commission" and "Department" respectively), in connection with the condemnation of certain property, the proceedings thereunder, the leasing, bidding, and the proposed bond issue under the Off-Street Parking Act, be declared illegal and unlawful. Before trial in the lower court, the other appellants herein intervened, and filed complaints similar to those of the original plaintiffs, and also asking for equitable relief by way of injunction, challenging the constitutionality of the Off-Street Parking Act.

This suit is brought by the individual appellants in various capacities, namely: As the owner of real estate in downtown Indianapolis, furnishing parking facilities to the public generally; as the owner of the real estate referred to as "Site 1" subjected to the condemnation proceedings herein and now leased for use as parking for the public generally; as the owners of real estate referred to in this litigation as "Site 2" which is the subject of condemnation proceedings herein and which is now leased as a parking lot for public use by such appellants; as taxpayers of the City of Indianapolis; as one who parks and pays parking meter charges on the city streets of Indianapolis, and as one who operates other parking lots and garages for public use in the City of Indianapolis; and on behalf of groups similarly situated.

Upon request, the trial court entered a special finding of facts and conclusions of law. The finding, conclusions of law and judgment of the lower court declared the act constitutional, and the proceedings thereunder by

the appellees proper and in accordance with the law in all respects.

The propriety and technical correctness of the assignment of errors is not challenged here. It included the overruling of the motion for a new trial, that the decision was not sustained by sufficient evidence and was contrary to law and the additional specifications that the court erred in its conclusions of law.

The briefs of the appellants fail to give a condensed recital of the evidence except that which pertains to the meetings of the commission at which the declaratory resolution for condemnation was considered and the legality of which is challenged by certain appellants. Hence, we have no issue of the insufficiency of the evidence to sustain the findings except as to that particular question. We are otherwise limited to the special finding of facts and conclusions of law based thereon in the consideration of the various questions raised in this appeal.

The briefs of the parties have resolved the questions here presented into four principal categories as follows:

1. The constitutionality of the Off-Street Parking Act, which gives the Commission the power to condemn and take property to be leased or sold to private operators for off-street parking, but deprives the Commission of any power to control the rates and charges to the public for such parking privileges.

2. The legality of the Commission's acts in leasing the real estate for parking purposes without adopting specifications with reference to the type of building, manner of operation and various other terms; and calling upon bidders for offers in which the bidders specified a large part of the terms for consideration of the Commission; the legality of the Commission's acts in connection therewith, for the hiring of an architect to procure plans and specifications under the terms of

one of the offers accepted for the construction of a building on one of the sites.

3. The validity of the meeting of the Commission at which the declaratory resolution was adopted for condemnation of the real estate.

4. The legality of the bond issue proposed by the City and Commission.

We shall take these questions up in the order enumerated.

I.

It is settled law in Indiana that the use of municipally owned property for off-street parking is a public use if the municipality operates the property. This was decided in *Phillips et al.* v. *Officials of Valparaiso, etc., et al.* (1954), 233 Ind. 414, 120 N. E. 2d 398, in an opinion written by Chief Justice Bobbitt. That case, however, did not involve the condemnation or leasing of any facilities by the city for operation by others.

Off-street parking facilities relieve traffic congestion on the streets, resulting from the increased number of motor vehicles and from the fact that streets were not originally laid out to carry present day traffic, create a situation which is the subject matter of valid legislation. This is stated to be the objective and purpose of the legislation in question. §48-8422 Burns' 1950 Replacement. The court decisions, through the centuries, recognize that changing economic conditions, create new uses and businesses that were not in existence or contemplated in earlier times, and that certain kinds of businesses are affected with a public interest to the extent that they may be regulated.

In *Munn* v. *Illinois* (1876), 94 U. S. 113, 24 L. Ed. 77, the court said on page 125:

"In their exercise it has been customary in England from time immemorial, and in this country

from its first colonization, to regulate ferries, common carriers, hackman, bakers, millers, wharfingers, innkeepers, etc., and in so doing to fix a maximum of charge to be made for services rendered, accommodations furnished, and articles sold. To this day, statutes are to be found in many of the States upon some or all these subjects; and we think it has never yet been successfully contended that such legislation came within any of the constitutional prohibitions against interference with private property."

Means and methods of transportation have changed from the time of canals and horse-drawn vehicles. In the earlier days mills, inns, ferries, warehouses, ■ livery stables and other like businesses were classified as a public calling or as "affected with a public interest," by reason of economic necessity. The newer fine-spun creations of this age are interwoven with the dead fabric of the past, yet the same basic principles apply. It could logically be said that parking garages today fall within the category of warehouses, inns and livery stables, originally. The first test of a public calling or "business affected with a public interest" was that of economic necessity. 75 Univ. Penn. L. Rev. 411; *Munn* v. *Illinois, supra* (1876), 94 U. S. 113, 24 L. Ed. 77; *Hockett* v. *The State* (1886), 105 Ind. 250, 5 N. E. 178.

A state or its agency may acquire property by eminent domain for a public use, or it may authorize a private individual to acquire such property, if it is to ■ be dedicated to a public use and falls within the group of activities historically classified as a public calling or one affected with a public interest. Such businesses, although privately owned, are given the power of eminent domain, with the attendant obligation of serving the public without discrimination, and at a reasonable rate. *Westport Stone Co.* v. *Thomas*

(1911), 175 Ind. 319, 94 N. E. 406; *Miller* v. *Southern Ind. Power Co.* (1916), 184 Ind. 370, 111 N. E. 308.

It is contended in this case, for the City to acquire the real estate involved (referred to as Sites 1 and 2) through its agencies and to lease it or sell it to a private individual for parking purposes limited to twenty years as proposed, is not taking the property for a public use, but for a *private use.* This argument is particularly compelling here, because the finding shows that some of the appellants own property sought to be taken, which is now being used for parking purposes, and further because under the 1953 amendment of the Off-Street Parking Act,

> "The Commission shall have no power in such resolution or otherwise to determine or set the amount of any charges made to the public . . ." Acts 1949, ch. 261, §10, p. 941; 1953 ch. 252, §2, p. 908, being §48-8430 Burns' 1955 Supplement.

The substance of the question then is, whether or not the use becomes private when the city, after taking appellants' real estate, leases the property, as proposed herein, and retains no right to control the lessee's rates and manner of operation in the public interest (except the restriction that it shall be used for parking purposes for a period of 20 years). It is contended that without such control the property falls back into private use and is no longer dedicated to public use.

All the briefs herein have extensively discussed the redelopment laws of different states, including Indiana, which authorize the acquisition of property in order to eliminate blighted and slum areas. These laws grant the power to sell all or part of such property to private individuals, after the redevelopment plans have been consummated. Such laws have been upheld against the contention that they permit the taking of private property from one person in order to give it to another.

The Redevelopment Laws or Slum Clearance Acts are hardly in point since the public purpose or use has been consummated at the time the property is ■ sold to private individuals. In the case before us the public use or purpose is to be served *after* the sale or lease of the property to a private individual. The case here is one requiring a continuing ownership or control over the property, more similar to that exercised under the Housing Authority Acts, in order to carry out their purpose and objective. *Berman* v. *Parker* (1954), 348 U. S. 26, 75 S. Ct. 98, 99 L. Ed. 27; *Gohld Realty Co.* v. *City of Hartford* (1954), 141 Conn. 135, 104 A. 2d 365; *Foeller* v. *Housing Authority of Portland* (1953), 198 Ore. 205, 256 P. 2d 752; *Hunter* v. *Norfolk Redevelopment and Housing Authority* (1953), 195 Va. 326, 78 S. E. 2d 893; *Herzinger* v. *Mayor & City Council of Baltimore* (1953), 203 Md. 49, 98 A. 2d 87; *Rowe* v. *Housing Authority* (1952), 220 Ark. 698, 249 S. W. 2d 551; *Belovsky* v. *Redevelopment Authority* (1947), 357 Pa. 329, 54 A. 2d 277; *Edwards* v. *Housing Authority of City of Muncie* (1939), 215 Ind. 330, 19 N. E. 2d 741.

It is true, the power of eminent domain cannot be granted to an individual or be exercised by the public corporation if its purpose serves purely a *private* ■ *or personal use.* In the leading case of *Fountain Park Company* v. *Hensler* (1927), 199 Ind. 95, 155 N. E. 465, 50 A. L. R. 1518, this court held invalid an act which granted the power of eminent domain to a chautauqua association. It should be noted there that the association was not dedicated to a public use, open to the public generally, and compelled to serve the public under the classification of a public calling, although its objective, no doubt, could be classified as charitable, philanthropic and educational.

The early test of a public calling or business was a

"holding out" to the public in a particular trade. This was based upon a fundamental concept that business was of two classes: public and private.

Thus, we have the term "common" carrier, or "common" innkeeper or "common" smithy as distinguished from one who engaged in the act only casually or on special agreement or contract. This distinction exists today with reference to the obligations of business "affected with a public interest." Historically, many public callings in the earlier days were permitted to operate by the state without regulation over the rates and charges to the public. The state later saw fit in many instances, to exercise such control by appropriate legislation and by the creation of commissions and administrative bodies for such purpose. 73 C. J. S., Public Utilities, §16, p. 1010; 75 Univ. Penn. L. Rev. 411.

The legislature may, in its discretion, determine that regulation over the rates and charges may or may not be necessary in the public interest to protect the public use. The appellees urge that control of the rates and charges for the off-street parking will be effectively controlled by competition or other conditions and that the legislature has so decided. The appellees point to the fact that the City and the Commission has the opportunity to increase competition by the establishment of more off-street parking from time to time and thereby indirectly control the charges and rates. However, we need not here consider such economic controls. The common law from time immemorial has granted relief from extortionate practices by a business classified as public calling or "affected with a public interest." 75 Univ. Penn. L. Rev. 411, 419; 28 Harvard L. Rev. 135, 149; 3 Holdsworth Hist. of Eng. Law (3rd Ed. 1923), 432; Holmes Common Law, p. 184.

Lord Ellenborough in *Allnutt and Another* v. *Inglis,*

*Treasurer of the London Dock Company* (1810), 12 East, 527, upon the public's right to reasonable rents for warehousing, said on page 542:

"But though this be private property, yet the principle laid down by Lord Hale attaches upon it, that where private property is affected with a public interest, it ceases to be *juris privati* only, and in case of its dedication to such a purpose as this, the owners cannot take arbitrary and excessive duties, but the duties must be reasonable."

The common law from the time of the Year Books is replete with cases which placed the duties and responsibilities of serving the public generally upon this limited group of specified businesses. This classification of "public callings" or businesses "affected with a public interest," comprises to a large extent what are known today as public utilities. They are in most cases regulated by the state. Upon the dedication of a business to a public use, it is established that such business is under a common law duty to serve all who apply so long as facilities are available, without discrimination. *The Portland Natural Gas and Oil Company* v. *State ex rel. Keen* (1893), 135 Ind. 54, 34 N. E. 818; *Hockett* v. *The State, supra* (1886), 105 Ind. 250, 5 N. E. 178; 73 C. J. S., Public Utilities, §7, p. 998.

This obligation to serve is without discrimination, not only as to service, but also as to person, and prices charged. It necessarily follows that price or rate changes, without notice, and from hour to hour, or minute to minute, cannot be made, and thus circumvent the principle of law involved. The duty to serve could be nullified if there were not the attendant duty also to serve at a reasonable charge. If a business "affected with a public interest" could make exorbitant charges for its services, it could thereby serve only whom it

saw fit, and when it saw fit, by manipulating its charges and prices. *Winfield* v. *Public Service Commission* (1911), 187 Ind. 53, 118 N. E. 531.

When the state fails or does not see fit to regulate the rates and charges or services by legislation or by creating a commission for the purpose, the public, nevertheless, still has the basic right under the common law, to be served in all particulars, without discrimination, and at a reasonable price, and may bring private actions to enforce the duties owed. *Fountain Park Company* v. *Hensler, supra* (1927), 199 Ind. 95, 155 N. E. 465, 50 A. L. R. 1518; *The Richmond Nat. Gas Co.* v. *Clawson* (1900), 155 Ind. 659, 58 N. E. 1049; 43 Am. Jur., Public Utilities and Services, §100, p. 642.

If the utility fails or refuses to serve on request, accordingly, it may be mandated to so serve. *State ex rel.* v. *Marion Light, etc., Co.* (1910), 174 Ind. 622, 92 N. E. 731; *Greenfield Gas Co.* v. *Trees* (1905), 165 Ind. 209, 75 N. E. 2; *The Central Union Tel. Co.* v. *Hopper, et al.* (1890), 124 Ind. 600, 24 N. E. 1091.

It has been held many times that a utility may be enjoined from cutting off service supplying a customer, because the customer refused to pay an unreasonable or excessive rate. *Whitmore* v. *N. Y. Interurban Water Co.* (1913), 158 App. Div. 178, 142 N. Y. S. 1098; *Borough of Washington* v. *Washington Water Co.* (1905), 70 N. J. Eq. 254, 62 Atl. 390; 43 Am. Jur., Public Utilities and Services, §100, p. 642, *supra.*

A consumer may sue to recover damages at common law resulting from discrimination by a utility as to services or rates. These are private rights which belong to the *individuals* constituting the public to whom the "holding out" of the business is

made. *St. Clair Borough* v. *Tamaqua & Pottsville E. Ry. Co.* (1918), 259 Pa. 462, 103 Atl. 287, 5 A. L. R. 20; *Lewis* v. *M. & C. C. of Cumberland* (1946), 189 Md. 58, 54 A. 2d 319; *Columbia Baking Co.* v. *Atlantic Gas Light Co.* (1948), 78 Ga. App. 241, 50 S. E. 2d 382; 43 Am. Jur., Public Utilities and Services, §§30, 33, 67, pp. 592, 594, 615; 73 C. J. S., Public Utilities, §30, p. 1051.

Not only the civil law protects the individuals composing the public against discrimination and extortion by public servants and callings, but also the early English criminal law. In the case of a miller or ferryman who takes more than the custom warrants, it is extortion. It was held one who builds and rents stalls at a public market for the selling of wares is criminally liable, if he extorts money by reason of a shortage of stalls. 2 Bish. C. L. (7th Ed.), §394; *Rex.* v. *Burdett,* 1 Ld. Raym, p. 148; *King* v. *Roberts,* 4 Mod. 101; Acts 1885, ch. 47, §1, being §10-901 Burns' 1942 Replacement.

Historically, the duty owed *to the individuals* composing the public, existed before the state assumed the prerogative of rate regulation. The common law right of the individual to compel service without discrimination or extortion exists regardless of any statute, charter or franchise, providing for such service to the public on reasonable terms. 43 Am. Jur., Public Utilities and Services, §22, pp. 586, 587; 75 Univ. Penn. L. Rev. 411.

In *Miller* v. *Southern Ind. Power Co.* (1916), 184 Ind. 370, 111 N. E. 308, this court said on page 373:

"The act under which the company was incorporated provides for service to 'towns and cities and to the public in general.' §5081, Burns' 1914, Acts 1907, p. 277. It is true that the said act of 1907 does not purport to fix rates or prescribe regulations of service, but such failure does not have the effect of absolving the company from common-law

obligations which, among other things, impose the duty of impartial service to the public."

The statutory provisions against rate regulation in the Off-Street Parking Act states:

"Provided, however, that the Commission shall have no power in such resolution or otherwise to determine or set the amount of any charges made to the public by any such lessee; provided further, that any such lease shall contain a restriction that such parking facility shall be used for parking purposes, except that such restriction shall not limit the powers of the commission under Sec. 9(5) [Burns' 48-8429(5)] of this act or need not prohibit the use of any part of the land for a use accessory . . . and except that such restriction need not extend for a longer period than twenty (20) years from the commencement of such lease." Acts 1949, ch. 261, §10, p. 941; 1953, ch. 252, §2, p. 908, being §48-8430(d) (1955 Supp.).

We point out that the statute in this case merely deprives the *commission* of the power "to determine or set the amount of any charges made to the public by any such lessee." §48-8430, *supra*. The statute does not purport to divest the state of its police power to regulate the charges except through the Off-Street Parking Commission; neither does the statute deprive members of the public of their *individual rights* to be served without discrimination at reasonable rates as given by the common law. These are the same rights which have existed against public callings, since ancient times, regardless of whether or not the legislature saw fit to regulate such business in that field.

In *Winfield* v. *Public Service Commission, supra,* (1911), 187 Ind. 53, 118 N. E. 531, the court said on page 67:

"Strict construction of any legislation granting authority, or franchises, is the rule when the question is whether the state has barred itself from

exercising its police power. This is shown by the decisions herein earlier cited."

Considerable discussion and argument have been expended by the parties on both sides of the issues here on the assumption that the proposed lessees are left unrestrained and uncontrolled in the operation of the off-street parking business, and on the question of the constitutional ability of the state to divest itself of its police power to regulate rates. In the Minnesota Rate Cases that question was present under a charter granting the railroad, through its board of directors, the power to fix its own charges and rates. However, the United States Supreme Court skirted around the issue after some discussion and decided the case on another and now famous issue and principle. *Chicago, M. & St. P. R. Co.* v. *State of Minnesota* (1890), 134 U. S. 418, 10 S. Ct. 462, 33 L. Ed. 970; *Minneapolis Eastern R. Co.* v. *State of Minnesota* (1890), 134 U. S. 467, 10 S. Ct. 473, 33 L. Ed. 985; See, also: *Home Teleph. & Teleg. Co.* v. *Los Angeles* (1908), 211 U. S. 265, 29 S. Ct. 50, 53 L. Ed. 176.

In *Winfield* v. *Public Service Commission, supra,* (1911), 187 Ind. 53, 118 N. E. 531, this court did not avoid that question. This court said on page 60:

"The state's power of control of such matters [rates] is one of the elements of state government, in the exercise of which the people are represented by the legislature. This element of government is commonly called the state's police power, and in the present case applies to the general interest of the citizens of the state in proper public service. The state may deprive itself of the power to exercise this power by granting directly to the public service companies in charters, or by franchises, freedom from the exercise thereof; but inasmuch as such grant of freedom is in derogation of common right, it is never presumed to have been made by the state, and the state will not be held to have abandoned the right to exercise its *police power,* unless

the state's intention so to do is expressed in terms so clear and unequivocal as to exclude doubt; and if doubt exists it must be resolved in favor of the state." (Our italics.)

However, the latter case, and the Minnesota Rate Cases should be distinguished from the case before us on the basis that those cases dealt with the power of *the state* to exercise its police power and thereby regulate rates, after an alleged abrogation or relinquishment of the right through a contract, franchise or charter. Those cases did not deal with the rights of the public, individually, to be served without discrimination at a reasonable price as distinguished from the power of the state to regulate. They did not hold the public's right, individually, to compel reasonable and impartial service, had been extinguished. There may be considerable doubt as to the ability of the legislature to bargain away or extinguish the common law rights of the individual to compel reasonable service without discrimination from one engaged in a public calling or a business "affected with a public interest." The result of such an act by the state would raise the issue of granting an immunity against extortionate practices and even confiscatory taking of property from users where a monopolistic condition was created. Such a divestiture of the individual rights is not attempted, in our opinion, under the Off-Street Parking Act, as we interpret it. *Terre Haute Gas Corporation* v. *Johnson* (1943), 221 Ind. 499, 45 N. E. 2d 484, 48 N. E. 2d 455; L. R. A. 1915 C., p. 261, Note.

Both the appellees and appellants contend over the correct interpretations of cases from other jurisdictions. *City and County of San Francisco* v. *Ross* (1955), 44 Cal. 2d 52, 279 P. 2d 529; *Poole* v. *City of Kankakee* (1950), 406 Ill. 521, 94 N. E. 2d 416; *Lowell* v. *Boston* (1948), 322 Mass. 709, 79 N. E. 2d 713; *Kern* v. *New-*

*ton City Commissioners* (1940), 151 Kan. 565, 100 P. 2d 709, 129 A. L. R. 1156.

These deal with the right of the state to acquire or lease public property for off-street parking without controlling the price to be charged by the lessee under varying statutes and conditions. We need not here take the time to discuss these cases, since they do not consider the common law rights of the public to be served, regardless of the state's negative attitude. They do not differentiate the fact that such business (of such lessees) are not totally unrestrained and uncontrolled, but are still subject to common law duty to serve the public, which may be privately enforced.

Price control alone would not seem to be the only means of assuring that property would be used to serve the public. The duty to serve at a reasonable rate is not the sole obligation of one assuming a public calling or utility business. There exists the attendant duties to serve without discrimination as to person, facilities, and at all reasonable times, as long as facilities are available. The legislation under consideration, to be constitutional, must give sufficient power to the commission to fix enough limitations on the use of the property taken, that the public use is protected and safeguarded; in other words, so that the property is used in a business that is public in nature and not one that is private.

It is an essential requirement that a business or enterprise must in some way be impressed with a public interest before it may become a public utility. Accordingly, whether the operator of a given business or enterprise is a public utility depends on whether or not the service rendered by it is of a public character and of public consequence and concern, which is a question necessarily dependent on the facts of the particular case." 73 C. J. S., Public Utilities, §2, p. 991.

The general tenor of the act shows that the parking facilities are to be open to the public generally as a public utility. The duties devolving upon the Commission are:

"To acquire such sites and cause the same to be improved, operated or disposed of so as best to carry out the purposes of this act. . . .

"(2). To hold, use, manage, operate, sell, lease, rent, or otherwise dispose of, in the name of such city, but for the use of and control by such department, any property, real or personal, or any part thereof, acquired, constructed or improved for use under the provisions of this act, on such terms and conditions as the commissioners shall deem to be *for the best interests of its bondholders, the department, the city and its inhabitants; . . .* " (Our italics.) Acts 1949, ch. 261, §9, p. 941, being §48-8429, Burns' 1950 Replacement.

It seems to us that the language of the statute is sufficiently broad that the character of the control which the City and Commission may impress on the property when leased or sold, will assure its public use and dedication for the purposes intended, without the control, by the Commission, over the rates to be charged for the off-street parking. It is necessary that the statute grant the power for placing such restrictions on the use of the property, in order for the statute to be constitutional; otherwise the property might be devoted to private use after its lease or sale by the Commission. The Commission has no discretion in failing or refusing to exercise such powers and taking such protective measures by terms and conditions in the lease as will assure the dedication of the property to the public use intended.

We, therefore, find the statute in question to be constitutional. We must now look to the leasing arrangements, terms and conditions, to determine whether or not the Commission exercised such power and provided

adequate safeguards to assure a dedication of the property to the public use intended.

## II.

We come then to the terms required in the leases and procedure followed by the appellees in asking for bids and in accepting bids for the leasing of Sites 1 and 2, which are the subject of this litigation. The appellants contend that the appellees failed to follow the statutory provisions in asking for bids. In substance, the appellants say that the Commission did not fix the terms and specifications, but instead requested the bidders to propose the terms, conditions and specifications under which the property was to be leased.

The special finding of the court shows that on August 21, 1953, the Commission adopted a resolution "that Site No. 2 be developed as a parking lot, and notices be sent to prospective bidders for the development, leasing, and operation of this site," and "that notice be prepared and Site No. 1 be advertised for bids for development, either as a garage or lot as an alternate." On September 30, and October 7, 1953, notices were accordingly published requesting bids which contained a brief description of the real estate. The notice in part stated:

"Proposals will be considered for the leasing of Site 1 as a lot or multifloor garage. Proposals should specify whether construction of said garage by the Indianapolis Off-Street Parking Commission, financing by said Commission, is contemplated or whether the lessee will construct any such garage at his own expense in accordance with specifications approved by the Indianapolis Off-Street Parking Commission. Proposals to lease Site 2 as a parking lot will be considered . . .

"Sealed proposals should specify the term of lease and the proposed rental and all other terms required by this notice, as well as other terms at the bidders' option."

On October 22, 1953, bids for leasing the sites were received and opened. With respect to Site No. 1, there were three bidders. One was on the basis of merely resurfacing the lot; one was on the basis of either constructing a four or five story building at the expense of the bidder; one was on the basis of constructing a five story building at the expense of the city. One proposal was on the basis of a five year lease with a percentage and minimum guarantee; one was on the basis of a 40 year lease; and one was on the basis of a 25 year lease with a flat rental. With respect to Site No. 2, bids were received for varying terms of years; one on a percentage minimum and guarantee basis, the other on a flat rental basis. Two proposals provided for black-topping by the Commission. The bid of Olin R. Grandle, doing business as the Grandle Parking Lot Company for Site No. 1 was ultimately accepted. It originally specified that "we will construct a multifloor parking garage. . . . We propose to engage an architect, work up the formation advertising, engage the general contractor and completely supervise the construction of the garage."

After some correspondence between this bidder and the Commission the bid was modified to conform with certain statutes and this new proposal was approved and accepted as a bid although it was not advertised for bids as modified. The bid for Site No. 2 as a parking lot by Ross and Helen Moore was approved.

The statute relevant to the bidding procedure in so far as applicable here, reads as follows:

"The Commission shall have the power to lease or rent to others any parking facilities or any property acquired for off-street parking purposes, after first adopting a resolution setting out its intention so to do and *specifications as to the terms of the lease, manner of operation and other requirements having a bearing on the value of the proposed lease,*

and giving notice of its intention by publication. . . . Such notice shall set forth the date on which offers will be received and considered, *the location, size and capacity of the property, the specifications adopted governing the leasing; and such other information as will secure free and open competition in the offers.* The award shall be made to the highest and best bidder, and such lease must be approved by the mayor. . . ." (Our italics.) Acts 1949, ch. 261, §10, p. 941; 1953, ch. 252, §2, p. 908, being §48-8430(d), *supra.*

"Such resolution shall set out the location and size of the proposed site and a *general description of the improvement proposed or the structure or structures proposed to be erected thereon.*" (Our italics.) Acts 1949, ch. 261, §11, p. 941, being §48-8431, Burns' 1950 Replacement.

It seems apparent to us that the Commission did not follow the statutory provision outlined. The question turns basically upon whether the statute requires the Commission to determine in advance the specifications and terms and conditions under which the lease is to be made, or contemplates that the prospective bidders are to submit their proposals in various terms and on various conditions. If the latter interpretation of the statute were followed it would practically eliminate competitive bidding on a price basis. The statute requires that the notice set forth "such information as will secure free and open competition." The resolution and the notice pursuant thereto do not specify the term of the lease, the size of, or character of the building, if any.

It is true, there may be competition as to quality, or upon another basis, than that of price alone, but where we have no other legal standard of value than money, competition without consideration of such standard, opens the door to fraud and capriciousness in the acceptance of bids. This is particularly true where the bidder may specify a substantial part of his own terms

and conditions. *Board, etc.* v. *Pashong* (1908), 41 Ind. App. 69, 83 N. E. 383; *The Board of Commissioners of Henry County et al.* v. *Gillies* (1894), 138 Ind. 667, 38 N. E. 40; *Wrought Iron Bridge Company* v. *The Board, etc.* (1898), 19 Ind. App. 672, 48 N. E. 1050.

We believe there is no merit in the argument that the words in the act such as "specifications," "free and open competition," and "and highest and best bidder" should be held to a meaning different from their usual meaning in connection with public bidding and contracting. If the legislature had intended the specifications to be proposed by the bidder, it could have said so.

Instead by a 1953 amendment to the controlling section of this statute, (§48-8430, *supra*), the ▮ following language was eliminated by the legislature from the statute:

"The award shall be made to the bidder offering the most advantageous terms in the judgment of the commissioners, giving due consideration to the experience and financial responsibility of the bidder."

Instead it substituted the following language:

"The award shall be made to the highest and best bidder."

The legislature had a purpose in changing this language. It appears to clarify the provisions of the statute with reference to bidding to avoid any possible implication that bids were not required to be upon the same specifications, terms and standards of value. This does not bar a request for bids with alternates in certain particulars. *Johnson* v. *Atlantic City* (1913), 85 N. J. L. 145, 88 Atl. 950.

It is true, as appellees contend, that specifications in requests for bids may be made so minutely specific that competition may be eliminated, but we do not have

that question arising in this case, and we see no reason to give that matter further consideration.

The appellants also complain that under the Grandle bid, which was accepted, the Commission contracted with Grandle to engage an architect to work out a design and specifications of the building which was to be built at the expense of the City. The bid was modified at the suggestion of the City and accepted by Grandle, in which it was provided that the City would build the building, but Grandle was to provide the architect, subject to the approval of the City. Since what we have said invalidates the acceptance of the bids in this case, the arrangements with reference to the employment of an architect which was part of the bidding agreement also falls, and we need not discuss that arrangement any further.

The statute provides specifically that if the property is leased, the resolution asking for bids, and necessarily the lease based upon the acceptance of such bids, shall contain "specifications as to the term of the lease, *manner of operation* and other requirements having a bearing on the value of proposed lease." (Our italics.) As said in the discussion of the constitutionality of this act, it is incumbent upon the Commission to place in the terms and conditions of the lease certain requirements to assure the dedication of the property to a public use for off-street parking during the term of the lease. It is elemental that the very minimum terms, in order to dedicate the property to a public calling, utility, or business affected with public interest, are that the lessee must agree to serve the public generally without discrimination as to persons, charges, or facilities, during reasonable hours. There is nothing in the terms of the proposed leasing arrangement which requires the operator to serve all members of the public impartially as to person, price

and services, during reasonable hours. It would seem, to protect effectively the public use, that some schedule of price or rates should be open to the public inspection, and which could not be changed without some reasonable time notice.

It is a well recognized principle of law that persons may engage in the same kind of business which may be either a public calling or a private calling, depending upon whether or not the individual is serving the public generally, or is under a special contract with other private individuals. A common example of this is the trucking business. Consequently, there should be terms and provisions which would assure that the off-street parking facilities would not be diverted under some private contract to the exclusion of the public generally. The bidding and the proposed leases were defective in failing to provide for adequate safeguards for public use in the respects above stated.

It is our opinion that conclusions of law 1, 2, 4, 5 and 6, with reference to the leasing are not sustained by the special finding of facts to the extent referred to above.

### III.

Appellants, William Krieg, Burford Danner and Helen Garrigues, whose land is being condemned, have attacked the validity of the Commission's confirmation of the declaratory resolution for condemnation of Sites 1 and 2 on the ground that the final action was not taken on the hearing date fixed in the notice (January 2, 1953) but was taken at a later meeting held on February 21, 1953. The named appellants are the only ones who set out a condensed recital of any of the evidence in their brief. That recital pertains solely to the issue of the sufficiency of the evidence to sustain the finding No. 14 of the court, that the meeting of

the Commission on February 21, 1953, was a continuation of the meeting of January 2, and was valid in confirming the declaratory resolution condemning the property of the named appellants.

Finding No. 13 shows that the notice was duly given for a hearing on objections for January 2 meeting as required by the statute. At the January 2, 1953 meeting, the evidence and findng No. 14 show persons present for and against the resolution were duly heard.

The special finding No. 14 states in part:

"On the later date to wit: January 2, 1953, the Commission held a hearing at the time provided for in such public notice to consider whether Declaratory Resolution No. 1 should be confirmed . . .

" the end of such hearing on January 2, 1953, the hearing was continued until February 21, 1953, at which time the Commission confirmed Declaratory Resolution No. 1."

At this same meeting the Commission also adopted an assessment roll of damages and notices were accordingly given in such matter of which we are not here concerned.

The minutes of the January 2, 1953, meeting which is in the evidence, however, states the meeting was postponed "two weeks." There are no minutes of any such meeting. The next minutes of any meeting of the Commission appears on February 21, at which time the resolution was confirmed.

Mr. Northrup, attorney for the Commission, testified that the February 21 meeting was a "continuation of the January 2 meeting."

The statute after providing for the giving of notice of the hearing date states:

"Such boards shall consider such objections and remonstrances, if any, and thereupon, *or at a later session,* as then continued or postponed to a time

certain, it shall take final action either confirming, modifying, or rescinding *its* original resolution." (Our italics.)   Acts 1933, ch. 15, §3, p. 37, being §48-2103, Burns' 1950 Replacement.

The purpose of the January 2 meeting under the statute was to give interested parties an *opportunity to appear, be heard,* and present their objections or remonstrances.  The Commission had the right and privilege of arriving at its decision at a later date after giving the interested parties a full opportunity to be heard on their objections at the January 2 meeting.  Whether or not the Commission arrived at its decision immediately or at some later date, would not seem to be prejudicial to the appellants, as long as they were given a full opportunity to file their remonstrances or make their objections and be heard.

In *Regenstreif* v. *Merz* (1937), 212 Ind. 112, 117, 6 N. E. 2d 702, this court gave consideration to a statutory provision somewhat similar to this and if anything, more strict.  In the statute under consideration in that case it provided:

"Such board shall consider such remonstrances, if any, *and thereupon* take final action." (Our italics.)   Burns' §48-2001.

There was no provision for any delayed decision or continuance.  Yet, this court determined that the decision of the board could be continued and delayed.  It should be noted in the matter before us, that the *hearing date was not continued or delayed* but *only the decision* delayed.  Due process requires, only, that a person be given a reasonable opportunity to be heard.  This opportunity was afforded all the appellants in this case after due notice in accordance with the statute. *Board of Commissioners* v. *Falk* (1943), 221 Ind. 376, 47 N. E. 2d 320, 145 A. L. R. 1190; *City of Indianapolis* v. *Holt* (1900), 155 Ind. 222, 57 N. E. 966; *Morrison* v.

*Indianapolis, etc. R. Co.* (1906), 166 Ind. 511, 76 N. E. 961; 16 C. J. S., Constitutional Law, §662(c), p. 1408.

There is no provision in the statute for any further or second hearing or filing of objections or remonstrances on the issue of the declaratory resolution. Just how appellants were harmed by the delay in confirming the declaratory resolution on February 21, 1953, is not made apparent. The error, if any, complained of, appears harmless.

Only appellant, William F. Krieg, is in any position to urge the point regarding the delay, since the evidence fails to show any of the appellants attended the meeting of January 2 to present remonstrances, except Krieg (by his attorney, Rocap). If a party has been duly notified of a meeting for a hearing, and he fails to appear personally or by counsel, he waives any right to complain of the action taken, so long as it is within the authority of the administrative body holding the meeting. *Huling* v. *The Kaw Valley Railway Co.* (1889), 130 U. S. 559, 9 S. Ct. 603, 32 L. Ed. 1045; *Skinner* v. *Pitman-Moore Co.* (1949), 119 Ind. App. 458, 85 N. E. 2d 279; *Taylor* v. *Drainage Dist. No. 56* (1914), 167 Iowa 42, 148 N. W. 1040; L. R. A. 1916 B, 1193, affirmed in 244 U. S. 644, 37 S. Ct. 651, 61 L. Ed. 1368; 18 Am Jur., Eminent Domain, §322, p. 966; 29 C. J. S., Eminent Domain, §242(b), p. 1213.

Krieg, the evidence shows, was given a hearing. His attorney spoke on the subject matter before the Commission at the time. No formal remonstrance was filed so far as the evidence shows. The other appellants did not ask to be heard. The giving of due and proper notice of the January 2 meeting to all appellants is not challenged. By this notice jurisdiction was acquired by the Commission. All appellants who desired to be heard, were heard.

The *material facts* stated in finding No. 14 of the trial court are sustained by the evidence. *The Chicago and Atlantic Railway Company* v. *Barnes* (1888), 116 Ind. 126, 17 N. E. 459; *Ward et al.* v. *The Berkshire Life Insurance Company* (1886), 108 Ind. 301, 9 N. E. 361.

### IV.

The appellants further contend that the conclusions of law Nos. 5, 6 and 7 are beyond the issues in this case.

These conclusions of the trial court dealt with the proposed bond issue. The trial court held, by these conclusions of law, that the revenue bonds to be issued under the Off-Street Parking Act, would not be a general obligation of the city and the issuance would not be prohibited by the constitutional provision on debt limitation, since the act provided the revenue bonds would be paid solely from revenue and proceeds from off-street parking facilities and from pledging parking meter revenues and would be a lien against parking facilities acquired with the proceeds from the sale of the bonds.

An examination of the complaint (sub. par. 5 and 6 of par. 10), of Van Camp Hardware & Iron Co. shows that it alleges and presents the following issues:

"(5). Said act and the Acts of 1945, Chapter 237, 1 through 7, as amended, permit the issuance of bonds which are a lien on said real estate after its condemnation by said Commission, consequently the acquisition of said land is not for a public purpose since the first lien on said land will be held by private parties.

"(6). Upon the issuance of bonds as provided by said Acts above referred to, as amended, interest payments will become due to private persons who hold said bonds under the provisions of said Acts, as amended, and such interest, payable out of the proceeds of parking meters which are charges made

for the use of public streets, is an improper use of public funds for private purposes."

The intervening complaint of John S. Elmore states:

"4. . . . The City has, however, entered into agreements to purchase part of sites 1 and 2 which are contingent upon the city's ability to issue, sell and realize the proceeds from bonds to finance such acquisition; . . .

"7. The Commission threatens to and will if not restrained pay from the general fund of the City of Indianapolis the sum of $70,000.00 for clearing the land on Sites 1 and 2. Section 3 of the Acts of 1951, Chap. 312, permits the use of funds derived from the parking meters situated on the streets of the City of Indianapolis to be used to pay the bonds with which to purchase or erect a parking facility by the Commission. The Commission threatens to and will unless restrained use such revenues for such purpose."

We feel such allegations sufficiently put into issue the subject matter of the validity of the proposed bond issue.

The appellants have failed to set out in their brief a condensed recital of any of the evidence presented at the trial under this issue. It is elemental that upon appeal the pleadings will be deemed amended to conform to the evidence, findings and judgment, if the allegations of the pleadings do not entirely cover the scope of the issues presented by the evidence. Acts 1881 (Spec. Sess.), ch. 38, §659, p. 240, being §2-3231, Burns' 1946 Replacement; *Boston* v. *Chesapeake & O. Ry. Co.* (1945), 223 Ind. 425, 61 N. E. 2d 326; *Breedlove et al.* v. *Bundy* (1884), 96 Ind. 319; *Gimbel* v. *Stolte, Administratrix* (1887), 59 Ind. 446.

Furthermore, these complaints ask for a declaratory judgment and raised the questions whether the statutory provisions for lien on the parking facilities acquired, and the provisions for the pledging of parking meter revenues are valid and constitu-

tional. To determine both of these issues the court had to determine that the bond issue was not a general obligation of the City of Indianapolis, because general obligation bonds under the law in Indiana cannot be a lien upon specific property by reason of state immunity.

The special findings make it clear a revenue bond issue is contemplated under the Off-Street Parking Act. (Findings 8, 18, 23 and 26.) We feel the parties hereto intended to test, and settle in these consolidated cases, at one time, if possible, all the legal issues arising out of the proceedings under the Off-Street Parking Act. It is in the public interest to settle such matters expeditiously, rather than in piecemeal fashion.

The issues were properly before the trial court and its conclusions of law with reference to the proposed bond issue were correct. *Edwards* v. *Housing Authority of City of Muncie, supra* (1939), 215 Ind. 330, 19 N. E. 2d 741; *Fox* v. *City of Bicknell* (1923), 193 Ind. 537, 141 N. E. 222; *Bollenbacher* v. *Harris, Mayor* (1925), 196 Ind. 657, 148 N. E. 417.

This judgment is reversed and the trial court is directed to restate its conclusions of law and grant the appellants' prayer for a permanent injunction to the extent herein indicated in connection with the bidding and leasing procedure, and for further proceedings consistent with this opinion.

Bobbitt, C. J., Emmert and Landis, JJ., concur.

Achor, J., concurs with opinion.

CONCURRING OPINION

ACHOR, J.—Appellants contend that, conceding the public necessity for off-street parking facilities, the Off-Street Parking Act (§§48-8421—48-8443, Burns' 1950 Repl. (1955 Supp.)) is unconstitutional for the reason that it expressly provides that ". . . the commission (authorized to establish utility) shall have no

power . . . to determine or set the amount of any charges made to the public . . ." for services of such utility. §48-8430(d), Burns' 1950 Repl. (1955 Supp.), Acts 1949, ch. 261, §10, p. 941.

Appellants urge that the above provision constituted an express abandonment by the state of its inherent and therefore inalienable right to exercise its police power over the utility for the purpose of regulating its charges made to the public. Appellants urge that if off-street parking facilities are of such public necessity to justify the condemnation of land for such public use, that the legislature is without constitutional authority to abandon or divest the state of the police power to regulate "the amount of any charges made to the public" for such facilities. There is substantial authority in support of the legal position asserted by appellant. See 6 C. J. S., Constitutional Law, §179, p. 549.

However, the appellant has misconstrued the above controversial provision of the Act. The law is well settled that the state may delegate a portion of its police power to a subordinate municipality, commission or board, created by the state.

However, the law is also well settled that, although the streets and highways of a city are of particular interest to the citizens of that city, because of the fact that they are also a part of the general highway system of the state they are subject to control and regulation by the state under its police power, unless the state has expressly waived or delegated to the municipality its right to do so. The same rule has also been held to apply with regard to public service companies which serve the residents of a particular city. *Winfield* v. *Public Service Commission* (1911), 187 Ind. 53, 118 N. E. 531.

By the same analogy, although off-street parking in the City of Indianapolis may be of particular interest

to the citizens of this city, since the services of the utility are also of interest to the general public, the state which has authorized the creation of the utility has the inherent and constitutional authority to control and regulate it, unless that right is expressly abandoned or delegated to a subordinate authority. *Winfield* v. *Public Service Commission, supra;* 55 L. R. A. (N. S.), 1915C, 268, 269.

In the words of Chief Justice Marshall in *Providence Bank* v. *Billings,* 4 Pet. 514, 561, 7 L. Ed. 939, 955, "Its abandonment ought not to be presumed in a case in which the deliberate purpose of the state to abandon it does not appear." See also, *City of Washington* v. *Public Service Commission* (1921), 190 Ind. 105, 129 N. E. 401; *Greensburg Water Co.* v. *Lewis* (1920), 189 Ind. 439, 128 N. E. 103; 28 A. L. R., 587-609.

However, in this case the constitutionality of the Act is not dependent upon the construction of the statute. In the case before us there was no attempt by the legislature, either express or implied, to abandon or delegate to the commission, a local municipal authority, the police power by the *state* to regulate the off-street parking utility and then to restrict the exercise of that power by the commission. On the contrary, the statute clearly and in concise terms merely provides that "the commission, shall have no power to determine or set the amount of any charges made to the public" by the utility. The statute makes no reference to the inherent right of the state itself to exercise its police power to regulate the rates charged. Therefore, that right is clearly retained by the state and could be made operative by appropriate legislation whenever in the opinion of the legislature the exercise of the state's police power might be required. Thus the right of the *state* to regulate the services and rates of the utility in controversy, although not a proper subject of contract between the

*commission* and the lessee, is incorporated in the lease by operation of law.

Section 10, page 941, Acts 1949 (§48-8430.(d), Burns' 1950 Repl. (1955 Supp.)), *supra,* does not divest the *state* of its police power to regulate the rates charged by off-street parking facilities, a public utility, the creation of which is authorized by the Act. That right remains in the state unabridged. Therefore, appellants' contention that the Act is unconstitutional, because of the denial of such right to the local commission, is not well founded.

NOTE.—Reported in 130 N. E. 2d 650.