CSL COMMUNITY ASSOCIATION, INC., Robert Phillips, James Elliott, Jeff Gilliam, Robert Luttrell, James Bohannon, and Brad Rupel, Appellants–Intervenors,

v.

JENNINGS NORTHWEST REGIONAL UTILITIES, Appellee–Plaintiff,

Jeffrey Day, Richard Schneider, and Robert Willhite, Defendants.

No. 40A01–0303–CV–81.

Court of Appeals of Indiana.

Aug. 29, 2003.

Bette J. Dodd, Timothy L. Stewart, Lewis & Kappes, Indianapolis, IN, Attorneys for Appellants.

Dennis H. Otten, Adam Arceneaux, Michael A. Wilkins, Ice Miller, Indianapolis, IN, Attorneys for Appellee.

## OPINION

KIRSCH, Judge.

CSL Community Association, Inc., Robert Phillips, James Elliott, Jeff Gilliam, Robert Luttrell, James Bohannon, and Brad Rupel (collectively "CSL") appeal the trial court's decision in its suit against Jennings Northwest Regional Utilities ("JNRU"), contending that the trial court erred in concluding that JNRU's rates were non-discriminatory and non-confiscatory pursuant to IC 13–26–11 et seq. and reasonable under the common law.

We affirm.

## FACTS AND PROCEDURAL HISTORY

JNRU is a regional sewer district that provides sewer services to CSL. All of its existing customers are members of CSL. In 1999, JNRU undertook a construction project to increase the capacity of its waste water treatment facility, improve its lift station, and extend its collection lines to serve other parts of its service area. It referred to this project as "Phase I" and planned to add new customers because of this improvement. The total cost of the project was budgeted at around $6 million. JNRU financed the project by issuing tax-exempt bond acquisition notes ("BANs").

Litigation ensued, stopping work on the project. Eventually, JNRU prevailed, but litigation costs and other factors swelled the cost of the project. To date, JNRU

has not completed the project and has added no new customers as a result of Phase I.

In September 2002, the BANs came due. JNRU was unable to pay the BANs and is currently in default on them. It later negotiated a low interest loan with the State Revolving Loan Fund to obtain the financing to pay off the BANs and cure the default.

On August 1, 2002, the JNRU Board of Trustees passed an ordinance raising the rates of JNRU customers (consisting of CSL) to create sufficient revenue to meet its expenses, including servicing the debt to the Revolving Loan Fund. This rate increase raised the minimum bill from approximately $15.00 to about $20.00, plus added a debt service surcharge of an additional $14.85 per month for the first five years and $24.60 per month for every year thereafter.

CSL challenged the rate increase by filing a complaint in the trial court. In response, JNRU filed suit requesting the trial court to declare that the Jennings County commissioners were without authority to hold a proposed public hearing on the JNRU rates and that JNRU was authorized to charge and collect the rates. Counsel for JNRU and the Jennings County commissioners agreed that the public hearing be waived and a trial on CSL's objections on the merits take place. CSL intervened in JNRU's declaratory judgment action and after the trial court determined that the case did not involve a public lawsuit, the trial court conducted a hearing on the rates. After the hearing, the trial court issued findings and conclusions in which it concluded that JNRU's rates were non-discriminatory and non-confiscatory pursuant to statute and reasonable under the common law. CSL now appeals.

## DISCUSSION AND DECISION

██ CSL contends that the trial court erred in determining that JNRU's rates were non-discriminatory and non-confiscatory pursuant to statute and reasonable under the common law.

██ Here, the trial court entered special findings pursuant to Ind. Trial Rule 52. The purpose of special findings is to provide the parties and the reviewing courts with the theory on which the judge decided the case in order that the right of review for error may be effectively preserved. *McGinley–Ellis v. Ellis*, 638 N.E.2d 1249, 1252 (Ind.1994). When the trial court has entered findings of fact and conclusions thereon, we apply the following two-tier standard of review: we must determine whether the evidence supports the findings and whether the findings support the judgment. *Chidester v. City of Hobart*, 631 N.E.2d 908, 910 (Ind.1994); *Harco, Inc. of Indianapolis v. Plainfield Interstate Family Dining Assocs.*, 758 N.E.2d 931, 941 (Ind.Ct.App.2001); *Lynn v. Windridge Co–Owners Ass'n, Inc.*, 743 N.E.2d 305, 309 (Ind.Ct.App.2001), *trans. denied.* The court's findings and conclusions will be set aside only if they are clearly erroneous, that is, the record contains no facts or inferences supporting them. *Harco*, 758 N.E.2d at 941; *Lynn*, 743 N.E.2d at 309. A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *Harco*, 758 N.E.2d at 941. We neither reweigh the evidence nor assess the credibility of witnesses, but consider only the evidence most favorable to the judgment. *Chidester*, 631 N.E.2d at 910; *Harco*, 758 N.E.2d at 941. Special findings, even if erroneous, do not warrant reversal if they amount to mere surplusage and add nothing to the trial court's decision. *Harco*, 758 N.E.2d at 941.

Regional districts operating utilities are governed by a statutory scheme that dictates, among other items, how they must set the rates they charge their customers. The statute grants broad discretion to regional districts to set rates by enacting ordinances. *See Taylor v. Fall Creek Regional Waste Dist.*, 700 N.E.2d 1179, 1184 (Ind.Ct.App.1998), *trans. denied* (1999). IC 13–26–11–8 grants the boards of regional districts the authority to "establish just and equitable rates or charges" for the use of and the service provided by a works, which are payable by the owner of each lot, parcel of land, or building that in any way uses or is served by a works.

IC 13–26–11–9 describes in further detail what constitutes "just and equitable" charges:

"(a) Just and equitable rates and charges are those that produce sufficient revenue to:

(1) pay all expenses incident to the operation of the works, including maintenance cost, operating charges, upkeep, repairs, and interest charges on bonds or other obligations;

(2) provide the sinking fund for the liquidation of bonds or other evidence of indebtedness and reserves against default in the payment of interest and principal of bonds; and

(3) provide adequate money to be used as working capital, as well as money for making improvements, additions, extensions, and replacements."

That statute further specifies that rates and charges too low to meet the described financial requirements are unlawful. IC 13–26–11–9(b).

Here, the evidence at trial supports the trial court's conclusions that the increased rates were necessary to pay JNRU's current operating expense and service its debt resulting from its expansion project. John Seever, a Certified Public Accountant, testified that the increased rates were calculated to provide sufficient funds for operations and to service the debt. He further testified that any lesser amount would be unlawful according to the statute because it would be too low to meet JNRU's financial requirements. Even CSL's witnesses, Ed Tinkle and Ethel Morgan, testified that the $6 million in debt represented actual costs to JNRU arising from Phase I and the attendant litigation. Seever stated that the situation was unfortunate, but that JNRU's Board of Trustees is well-focused on solving the financial problems connected with the Phase I expansion as quickly as possible. He also explained that the State Revolving Loan Fund financing was the best available option to keep the BAN holders from taking action based on JNRU's default. He testified that since acquiring the sewer system in the early 1990s, JNRU has never raised the customers' sewer rates and that even without the expansion project, JNRU needed to raise its rates nearly 35% to have sufficient operating funds. He also testified that the rates of comparable sewer districts were reasonable but higher than JNRU's former rates. Even with the higher increase after the fifth year, which will bring the average JNRU bill to $56.35, JNRU's rates will be comparable to the current rates of similar regional sewer and conservancy districts, which range from $45.00 to $60.60. Seever explained that had the construction project proceeded according to plan, the average customer bill would have been between forty-five and fifty dollars per month. Finally, he testified that JNRU's rates were cost-based, but were not based on the cost of service to CSL households.

CSL seizes on this point and argues that the rates are inequitable because they are not based on the cost of providing service

to its members' homes. Specifically, it points to evidence that the collection lines provide no service to CSL and that the waste water treatment plant is massively oversized compared to CSL's current and future need. However, unlike investor-owned utilities, which are subject to a different statutory rate requirement scheme and regulation of their rates by the Indiana Utility Regulatory Commission, the statute governing regional districts does not require rates to be based on cost of service. Rather, IC 13–26–11–2 provides that the rates or charges for a sewage works provided by a regional district may be determined based on "[a] combination of ... factors that the board determines is necessary to establish just and equitable rates or charges." JNRU's rates meet this test.

Nonetheless, CSL maintains that JNRU's rates violate its common law right to reasonable rates for sewer service. In *Foltz v. City of Indianapolis,* 234 Ind. 656, 667, 130 N.E.2d 650, 654 (1955), our supreme court faced a challenge to an Indianapolis ordinance that condemned certain property for the purpose of constructing off-street parking facilities. In doing so, it discussed a type of business which, though private, was known as "a public calling or one affected with a public interest," *id.,* such as common carriers. The court stated that such businesses have "the attendant obligation of serving the public without discrimination, and at a reasonable rate." *Id.* CSL argues that these statements show a recognition of a common law right to reasonable charges for utilities, including sewer service. It further contends that JNRU's rates violate this common law right. However, the *Foltz* court discussed the duty of such entities to provide nondiscriminatory pricing, that is, to avoid selecting who they would and would not serve by virtue of setting the price differently for different customers. Here, there

is no indication that JNRU has engaged in discriminatory pricing. Indeed, CSL members are JNRU's only customers. To the extent that *Foltz* can be read as granting a common law right to the public to have sewer service at a subjectively reasonable rate, we believe that the statutory scheme governing rate setting by regional districts operating utilities has subsumed the common law in this area. Indeed, our supreme court has explained its holding in *Foltz* as "where a business is affected by the public interest and the legislature has not provided a procedure to assure fair and reasonable rates, the common law will supply the omission." *State ex rel. Indianapolis Water Co. v. Boone Circuit Court,* 261 Ind. 583, 586, 307 N.E.2d 870, 872 (1974). *See also, e.g. Town Bd. of Orland v. Greenfield Mills, Inc.,* 663 N.E.2d 523, 529 (Ind.1996) (however strong historical precedents may have been, common law doctrines regarding downstream landowners have been abrogated with respect to public sewage treatment projects by enactment of statutory scheme). Because the legislature has supplied the procedure for rate setting by regional sewer districts, no common law right arises to service at a specified rate.

We recognize that a significant financial burden has been imposed on CSL homeowners and that JNRU's expansion plans may have been ill-advised. However, the uncontroverted evidence shows that JNRU has actually expended approximately $6 million on Phase I at this point in time, and that JNRU, as a quasi-public entity, has no means of generating revenue besides the rates it charges its customers. Further, the credit markets are no longer available to JNRU as a result of its default on its BANs, so raising funds by borrowing in the open market is no longer an option. Were we to hold that JNRU's rates were unfair, the likely result would

be that JNRU's BAN-holders would force JNRU into receivership, and the costs to its customers would only increase. In any event, the trial court's findings are amply supported by the evidence, and those findings support its conclusions.

Affirmed.

BAILEY and VAIDIK, JJ., concur.